**Oby BURKS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 16947.**

United States Court of Appeals
Ninth Circuit.

Feb. 1, 1961.

Morris Lavine, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Robert J. Jensen, Timothy M. Thornton, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS, BARNES and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

Appellant was one of twenty individuals indicted for conspiracy (18 U.S.C. § 371) (a) to accept wagers; (b) to evade the wagering occupational tax (26 U.S.C. § 4411); and (c) to evade the excise tax imposed by 26 U.S.C. § 4401, in violation of 26 U.S.C. § 7201.

The objects of the conspiracy alleged in Count I were to be accomplished through the conducting of a wagering pool or lottery commonly known as the "numbers." Defendant Oby Burks was the alleged "banker"; defendant Florence Wilson was the alleged "bookkeeper"; and the eighteen other defendants. were allegedly "writers", i. e., individuals. who would accept bets from betters, deduct the writer's commission, pay the "receipts" to the "bank" and deliver "winnings" from the "bank" to the betters. The overt acts charged in Count I were that defendant Burks arranged a credit card charge account for his various. writers, and that they severally charged gasoline to those accounts. Burks was. acquitted on this count, and convicted in substantive Counts II, III, IV, V and VI.

In Count II, defendant Oby Burks was charged with conducting a wagering pool and lottery in February 1959 in Los. Angeles, California, and in failing to pay an excise tax of ten per cent on said wagers before March 31, 1959, in violation of 26 U.S.C. § 4401, and in wilfully and knowingly attempting to evade the payment of the taxes so due, a felony (26 U.S.C. § 7201). The other defendants were named as aiders and abettors, and hence principals. 18 U.S.C. § 2. Thus a felony was charged against all.

Counts III and IV made the same charge with respect to the months of March and April 1959.

Count V charged that between January 1, 1959, and June 12, 1959, all defendants were conducting a wagering pool and lottery, and hence were required to register with and supply information to the Internal Revenue District Office in Los Angeles (26 U.S.C. § 4412), and wilfully failed so to register and to supply such information (26 U.S.C. § 7203).

Count VI charged that in that same period, appellant engaged in the same business activities without paying the

special tax (26 U.S.C. § 4411), in violation of 26 U.S.C. § 7262.

Appellant's first and his primary point urged on this appeal, is that the evidence introduced against him was obtained through a search and seizure violative of the Fourth and Fifth Amendments to the Constitution of the United States. The arrest was made by state officers in cooperation with federal officers. As appellee states in its brief: "There is no question [but] that there was federal participation in the arrest and subsequent search by a federal agent."

■ Admittedly, no search warrant was issued and we need not, therefore, consider the requirements for the issuance of search warrants. But not every search without a warrant is unlawful; it has long been recognized that where there exists a lawful arrest, a reasonable search incidental to such arrest requires no warrant, and no oath or affirmation of facts sufficient to support its issuance. Thus the government seeks to justify the search herein, on the ground that it was incidental to a lawful arrest. See Abel v. United States, 1960, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668; United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; People v. Tahtinen, 1958, 50 Cal.2d 127, 323 P.2d 442, certiorari denied 358 U.S. 853, 79 S.Ct. 85, 3 L.Ed.2d 88.

We turn, then, to a consideration of the arrest made here, and the circumstances surrounding it. As the Supreme Court said in Rios v. United States, 1960, 364 U.S. 253, at page 255, 80 S.Ct. 1431, at page 1433, 4 L.Ed.2d 1688, "resolution of the question [of the lawfulness of the arrest] requires a particularized evaluation of the conduct of the officers involved." Thereafter we shall consider the legal principles which determine whether the arrest was lawful. With regard to the circumstances of the arrest here involved, we adopt generally the statement of facts as related by appellee.

Officer Willis J. Gough of the Los Angeles Police Department had spent six years in the Administrative Vice Division of the department specializing in policy and numbers. He had participated in over a hundred cases and had testified in State of California courts as well as federal courts on his specialty. He had spent five months on the Burks case and the three months immediately preceding the arrest were spent entirely on the Burks case, conducting surveillance of what were referred to as "floating drops." Paul Duncan of the Los Angeles Police Department who participated in the arrest has been a police officer for eight years and had spent three years in the Administrative Vice Division specializing in bookmaking and lottery. He had worked several hundred cases and had testified in Municipal and Superior Courts of the State of California and in the United States District Court on his specialty. He had been working on the Oby Burks case five months jointly with federal officers. The "floating drops" which the police officers and Special Agent Arthur S. Katayama of the Internal Revenue Service had under surveillance were located at different periods of time in an apartment building in the 1300 block on West Vernon; 2286 West 22nd Street; 1475 West Adams; 1310 South Wilton Place; and 1541 South Western Avenue, all in the County of Los Angeles. The officers had the location at South Wilton Place under surveillance for approximately four days prior to the arrest. They had located the "drop" at 1541 South Western by tracing the telephone number of Oby Burks, which had been transferred from 1475 West Adams to the location at 1541 South Western, apartment 10, the scene of the arrest.

The automobile of Oby Burks was seen on several occasions at the South Wilton Place "drop" and the Western Avenue "drop." Through a check with the Department of Motor Vehicles it was learned that the 1959 Chevrolet bearing Registration Number RWP–993 was registered to Oby Burks and Florence Wilson, a co-defendant.

Surveillance was conducted at several of the "floating drops" mentioned before, during the five month period. A "drop" was defined as a location where the writers bring the wagers on numbers and leave the wagers there with the money collected. During the surveillance of the drops, the officers observed a number of cars and a number of people appearing. They parked in front or across the street, and would go into the building and stay for short periods of time and then return to their cars and leave. Generally these transactions took place prior to the post time of the third race, at approximately 1:30 P.M. When the people entered the various apartments they would remain for short periods of time, perhaps two or three minutes or five at the most, and then return and drive away.

On June 12, 1959, the day of the arrest, surveillance commenced at approximately 7:00 A.M. After having apartment 10 at 1541 South Western under surveillance for approximately two hours, the officers observed Charles Brown drive his vehicle to the location, enter apartment 10, leave shortly thereafter, and drive away. Charles Brown, a co-defendant, was known to the police as a "numbers writer."

After Brown had left the area, the two police officers and the Special Agent of the Internal Revenue Service proceeded to apartment 10. Upon arriving at the door they were able to look through the venetian blinds which were tilted slightly, giving them a view of Burks seated on a couch in front of the window. Mr. Burks had a telephone in his left hand which was up to his ear and with his right hand he had a pencil and he appeared to be writing on paper on a coffee table in front of him. On the table was a green card, approximately an inch and three-quarters by two and one-half or three inches in size, and on it were printed numbers. There were other papers also lying on the desk in front of Burks. As Officer Duncan looked through the window he was able to observe several different cards or group of cards which showed the operation of the numbers game in that it showed the "cuts" in the numbers or the odds given on the numbers. In addition, to the left of the cards referred to were pieces of paper with notations which, in the opinion of the officer, were wagers on numbers. From his position outside the window the officer saw a piece of paper that contained the notation "C–24" and below that "260–1.00". There was a small manila envelope, lying on a small table with a lamp near the window. In the upper right hand corner of this manila envelope was the notation "C–24".

Officer Paul Duncan explained that the notification slips on the coffee table were slips put out by a banker in the numbers business to show which numbers were being reduced in the odds that were being paid. The papers which Officer Duncan referred to were marked Plaintiff's Exhibits 8 and 9 for identification upon the motion to suppress and were subsequently admitted into evidence. Based on his opinion as an expert in the field of the numbers game, Officer Duncan testified that the markings of Plaintiff's Exhibit 8, "C–24", referred to the identification of the writer or controller. The "260" was the number wagered on, and the "1.00" indicated a $1.00 wager was made on number 260. The officer further explained that the use of a number "C–24" is common practice to indicate the person who picks up the wager in the operation. The "C" would generally represent a controller as opposed to, for example, an "R" number which would represent a route. Upon observing the above, the officers knocked on the door. The door was opened by co-defendant, Florence Wilson. Officer Gough entered first and stated that he placed the appellant under arrest for "conspiracy to violate the numbers or the wagering stamp."

Special Agent Katayama recalled that Officer Gough told appellant: "You are under arrest for conspiracy." Fifteen or twenty minutes later when appellant asked Duncan, " 'What is going on?' we (sic) told him 'You are under arrest.'

He said 'for what,' and we (sic) said: 'Mr. Burks, we think you know better than we do.'" Apparently, Officer Duncan who entered after Officer Gough and who was displaying his badge, also advised Mr. Burks that he was under arrest.

A ledger book was recovered subsequent to the arrest of Mr. Burks in the apartment. It was marked upon motion to suppress as Exhibit Number Four (at the trial it was referred to both as Plaintiff's Exhibit 1 and 4). The ledger book showed the route number or control number, date, the collections, the "hits," the shorts, the overages and the credits involved in this operation. It is the business record of a numbers pool. It indicates the amount turned in each day by the various "writers."

The officers also found two address books and gasoline credit cards of the Tidewater Gas Company. Based on this, the officers relayed information to fellow officers, who in turn arrested several other co-defendants.

Upon completion of the motion to suppress evidence, appellant Oby Burks and several co-defendants waived trial by jury and consented to be tried together. In addition, appellant Burks, through his counsel, stipulated that the evidence that was considered on the motion to suppress and was relevant could be considered by the court as being in evidence at the trial. In addition, several stipulations were entered into between various co-defendants including appellant. The stipulations were as follows:

1. None of the defendants had paid any occupational tax for the fiscal year involved in this case, that is, the occupational tax referred to in 26 U.S.C. § 4411.

2. None of the defendants had registered with or supplied any information to the official in charge of the Internal Revenue District at Los Angeles for the taxable year referred to in the indictment, pursuant to 26 U.S.C. § 4412.

3. For the month of February 1959, the collection columns in the ledger book for each account totaled $1,621.08.

4. For the month of March 1959, the collection columns in the ledger book for each account totaled $10,176.70.

5. For the month of April 1959, the collection columns in the ledger book for each account totaled $7,714.25. At the trial the ledger book which was found at Oby Burks' apartment, apartment number 10, 1541 South Western, Los Angeles, California, was marked as Exhibit 1 and was admitted into evidence.

Florence Wilson was employed by Oby Burks as a bookkeeper and it was her duty to maintain this particular ledger book, the majority of which was in her handwriting.

An examination of Exhibit 1 shows that it is a business record, kept on a daily basis, of certain transactions of each of certain numbers game "writers" who were either identified by nicknames, such as "Tricky" or a code name, such as "C–24", or in some instances by their last name, for example, "McCoy". The entries indicated the "hits" which were made and the date on which they were made, the amount of money collected from each particular "writer." Three paper bags containing numbers, receipts and other lottery paraphernalia were also found at apartment 10, 1541 South Western, at the time of the arrest. These paper bags contained "the action" of the organization for June 8, 9 and 10 of 1959. Exhibit 18 contains the handwriting exemplar of the appellant. Keith L. Woodward of the Los Angeles Police Department qualified as a handwriting expert and testified that the exemplar card bearing the name of Oby Burks was written by the same person who wrote O. Burks on the gas credit cards, Plaintiff's Exhibit 11. In addition, appellant's handwriting appeared on the inside back cover of the ledger book.

█ If the arrest just described is valid, then, as we have seen, the subsequent search and seizure were valid.

State law determines the validity of arrests without warrants, subject to such minimum standards as the Supreme Court may rule are required by constitutional standards. United States v. Di Re, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210; Johnson v. United States, 1948, 333 U.S. 10, 15, note 5, 68 S.Ct. 367, 92 L.Ed. 436; Butler v. United States, 9 Cir., 1959, 273 F.2d 436, 441, note 12. Thus it is not relevant that appellant was finally indicted for a federal offense; if his arrest was valid under state law, the subsequent search and seizure was valid and the evidence so obtained admissible in the federal prosecution. We turn, then, to California law.

California Penal Code Section 836 provides:

"Arrests by Peace Officers. A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant, arrest a person:

"1. For a public offense committed or attempted in his presence.

"2. When a person arrested has committed a felony, although not in his presence.

"3. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it.

"4. On a charge made, upon a reasonable cause, of the commission of a felony by the party arrested.

"5. At night, when there is reasonable cause to believe that he has committed a felony."

Subsections 4 and 5 are clearly no help to the government, and there is no sufficient basis for claiming the arresting officers knew, prior to the entry and the seizure of the records later introduced in evidence, that a felony had been committed outside the presence of the defendants (subsection 2).

Thus, appellee government properly relies on the terms of subsections 1 and 3, and primarily subsection 1.

Was a public offense being committed or attempted in the presence of a peace officer?

In California "a public offense" is synonymous with "a crime." Cal.Penal Code § 15. A crime includes both felonies and misdemeanors. Cal.Penal Code § 16. A policeman of a city or town is a peace officer. Cal.Penal Code §§ 7, 817. Two of the arresting officers, Gough and Duncan were "police officers for the City of Los Angeles." The third officer present, Katayama, was a Special Agent of the United States Treasury Department. California Penal Code § 337a makes it a crime for any person (1) to engage in bookmaking, or (2) occupy any room with papers or device for the purpose of recording or registering any bets or purported bets on the result or purported result of any lot, chance or contingent event, or (3) hold money for any such bet, or (4) record or register any bet, or (6) offer or accept any bets. This section applies by its terms to any person performing in any single instance any such prohibited act.

The facts as to what was observed by the peace officers are unlike some reported cases where, for example, a peace officer sees a citizen, unknown to the police, walk from an apartment in a "bad neighborhood," look around, and enter a taxicab, Rios v. United States, 1960, 364 U.S. 253, 254, 80 S.Ct. 1431, 4 L.Ed.2d 1688; or, as another example, a case where two citizens, unknown to the police, are observed as pedestrians at night in a locality wherein warehouses exist. People v. Simon, 1955, 45 Cal.2d 645, 290 P.2d 531. The mere presence of an individual unknown to the police, in a suspicious place, can raise merely a suspicion that he has violated the law or committed a crime. Such suspicion cannot justify an arrest. Poldo v. United States, 9 Cir., 1932, 55 F.2d 866, 869. What is required are *circumstances represented to the officers through the testimony of their senses sufficient to justify them in a good faith belief that the defendant is violating the law.* Draper v. United States, 1959, 358

U.S. 307, 324, 79 S.Ct. 329, 3 L.Ed.2d 327, (dissent); Carroll v. United States, 1925, 267 U.S. 132, 161, 45 S.Ct. 280, 69 L.Ed. 543. The arrest must be based upon evidence. Brown v. United States, 9 Cir., 1925, 4 F.2d 246, 247.

■ Here the officers have been observing the appellant Oby Burks' actions for some five months. They had observed his automobile at various locations in Los Angeles which they suspected were "drop-spots" used in the "numbers racket." They knew that such "drop-spots" changed as to location. They knew that whatever appellant Burks was doing, he too was changing locations. They knew that despite such change of locations of doing "business," he maintained the same telephone number. They had observed the attendance of known gamblers at such locations.

With this knowledge, they approached the premises occupied by Burks on June 12, 1959. They saw him (and his companion) through the window. They recognized on the table before the appellant the type of peculiar cards made use of by the gambling fraternity as paraphernalia necessary for and used in the operation of the numbers game. These peace officers were not patrolmen on a beat—they possessed expertise and knowledge based on years of experience. They saw with their own eyes "sufficient to justify them in a good faith belief" that the appellant Burks was at that moment violating the law of California hereinabove quoted. This was something far more than an "exploratory search." We hold the arrest valid, and the search incidental to the arrest a valid search, and hence the evidence was seized pursuant to a valid seizure.

In Johnson, supra, it was conceded [333 U.S. 10, 68 S.Ct. 370] "that the arresting officer did not have probable cause to arrest petitioner until he had entered her room and found her to be the sole occupant." That is not here true. Thus here the government is not required to justify the arrest by the search and the search by the arrest,

which, of course, cannot be done. We cannot read Johnson, supra, as over-ruling Rabinowitz, supra, [339 U.S. 56, 70 S.Ct. 434] wherein the rule is laid down that "the recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case," citing Go-Bart Importing Co. v. United States, 1931, 282 U.S. 344, 357, 51 S.Ct. 153, 5 L.Ed. 374.

■ We cannot agree with appellant that "the right to search is one that must be made by a magistrate, not by a police officer," *in all cases.* The police officer must have that right, provided always he has sufficient proof before him to come to the conclusion, as a reasonably prudent man, in good faith, that he has witnessed the commission of a crime in his presence.

"Evidence required to establish guilt is not necessary. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879; Draper v. United States, 358 U.S. 307, 79 S. Ct. 329, 3 L.Ed.2d 327. On the other hand, good faith on the part of the arresting officer is not enough. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense had been committed (cases cited)." Henry v. United States, 1959, 361 U.S. 98, at page 102, 80 S.Ct. 168, at page 171, 4 L.Ed.2d 134.

■ A lawful search incident to a valid arrest does not raise the issues passed upon by the recent Supreme Court decisions abrogating the "silver platter doctrine." Elkins v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 1439, 4 L.Ed.2d 1669; Rios v. United States, supra. In those cases, the Oregon and California courts respectively had found the evidence petitioner sought to suppress had been seized by state officers under circumstances which had rendered the search and seizure unlawful. Elkins, supra, 364 U.S. at page 207, 80 S.Ct. at page 1438; Rios, supra, 364 U.S. at page 254, 80 S.Ct. at page 1432.

"[U]pon no possible view of the circumstances revealed in the testimony of the Los Angeles officers could it be said that there existed probable cause for an arrest at the time the officers decided to alight from their car and approach the taxi in which petitioner was riding. Compare Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L. Ed. 1879; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134. This the Government concedes." Rios, supra, 364 U.S. at page 261, 80 S.Ct. at page 1436.

We recognize that in coming to the conclusion herein announced it may conceivably be argued that we are failing to follow the general rule laid down by the principal majority opinion of Mr. Justice Douglas in McDonald v. United States, 1948, 335 U.S. 451, 69 S.Ct. 191, 194, 93 L.Ed. 153. That was a case in which Mr. Justice Murphy concurred with Mr. Justice Douglas, and Justices Black and Rutledge concurred in the result. Justices Jackson and Frankfurter made up the majority when they concurred in the result, but characterized the principal majority opinion as "reject[ing] the search * * * without saying wherein it was wrong," and thought it proper and "helpful to lower courts" to state why the search was bad. We read the concurring opinion (by Mr. Justice Jackson) to state as a fact in that case that the officers were *not* legally in the hallway when they observed over the transom the violation of law then taking place. We have cited sufficient of the opinion in the margin, we think, to establish that fact.[1] Thus we differentiate

1. "However, the officer in charge of the investigation took the matter into his own hands. He neither had nor sought a search warrant or warrant of arrest; he did not then have knowledge of a crime sufficient, even in his own opinion, to justify arrest, and he did not even know that the suspect, McDonald, was in the rooming house at the time. Nevertheless, he forced open the window of the landlady's bedroom and climbed in. He apparently was in plain clothes but showed his badge to the frightened woman, brushed her aside and then unlocked doors and admitted two other officers. They then went to the hall outside the room rented and occupied by defendant. The officer in charge climbed on a chair and looked through a transom. Seeing the defendant McDonald engaged in activity which he considered to be part of the lottery procedure, he arrested him and searched the quarters. The Government argued, and the court below held, that since the forced entry into the building was through the landlady's window, in a room in which the defendant as a tenant had no rights, no objection to this mode of entry or to the search that followed was available to him.

"Doubtless a tenant's quarters in a rooming or apartment house are legally as well as practically exposed to lawful approach by a good many persons without his consent or control. Had the police been admitted as guests of another tenant or had the approaches been thrown open by an obliging landlady or doorman, they would have been legally in the hallways. Like any other stranger, they could then spy or eavesdrop on others without being trespassers. If they peeped through the keyhole or climbed on a chair or on one another's shoulders to look through the transom, I should see no grounds on which the defendant could complain. If in this manner they, or any private citizen, saw a crime in the course of commission, an arrest would be permissible.

"But it seems to me that each tenant of a building, while he has no right to exclude from the common hallways those who enter lawfully, does have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry. Here the police gained access to their peeking post by means that were not merely unauthorized but by means that were forbidden by law and denounced as criminal. In prying up the porch window and climbing into the landlady's bedroom, they were guilty of breaking and entering—a felony in law and a crime far more serious than the one they were engaged in suppressing. Having forced an entry without either a search warrant or an arrest warrant to justify it, the felonious character of their entry, it seems to me, followed every step of their journey inside the house and tainted its fruits with illegality. Cf. Weeks v. United States,

this case from McDonald, supra, on its facts, and in accordance with the instructions the Supreme Court has seen fit to give us.

We find no merit in appellant's next proposition, i. e., that Count VI fails to specify guilty knowledge and wilfulness. The statute under which appellant was charged does not refer to a wilful or knowing failure to pay the gaming tax. 26 U.S.C. § 7262. The rule of Lambert v. People of State of California, 1957, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed. 2d 228, does not apply to crimes created by statute which involve public welfare. Reyes v. United States, 9 Cir., 1958, 258 F.2d 774; United States v. Juzwiak, 2 Cir., 1958, 258 F.2d 844, certiorari denied 359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639; Madsen v. United States, 10 Cir., 1947, 165 F.2d 507, 509–510.

Nor is there any substance to the claim of appellant as to the alleged insufficiency of the evidence.

The judgment of conviction on all counts is affirmed.

232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 [L.R.A.1915B, 834, Ann.Cas.1915C, 1177]; Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367 [92 L.Ed. 436.]" Id., 335 U.S. at pages 457–459, 69 S.Ct. at pages 194–195.