STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
JAMES S. SMITH, DEFENDANT-APPELLANT.

Argued February 20, 1962—Decided June 4, 1962.

*Mr. Clive S. Cummis* argued the cause for appellant (*Mr. Abraham L. Honigfeld,* on the brief).

*Mr. Brendan T. Byrne,* Essex County Prosecutor, argued the cause for respondent (*Mr. Peter Murray,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendant was convicted of possession of heroin in violation of *R. S.* 24:18–4. We certified his appeal before the Appellate Division acted upon it.

During the pendency of the appeal, *Mapp v. Ohio,* 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081 (1961), was decided. There, overruling *Wolf v. Colorado,* 338 *U. S.* 25, 69 *S. Ct.* 1359, 93 *L. Ed.* 1782 (1949), the Court held the Federal Constitution barred the use by a State of evidence it seized through an illegal search.

The sole claim before us is that the conviction should be reversed for an alleged violation of the doctrine of *Mapp.*

I.

The first question is whether *Mapp* must be applied to a search made before June 19, 1961, the date of that decision.

There is no easy solution to the problem of retroactive application of decisional law in criminal matters. We seek essential justice both to the individual and to the community. If a prior judgment is fundamentally unfair in the light of a later decision, there is strong compulsion to reopen. But a change of law need not mean the earlier rule was so plainly wrong that every judgment in which it figured must be unjust. See *Sunal v. Large,* 332 *U. S.* 174, 67 *S. Ct.* 1588, 91 *L. Ed.* 1982 (1947) ; *Warring v. Colpoys,*

74 *App. D. C.* 303, 122 *F. 2d* 642, 136 *A. L. R.* 1025 (*D. C. Cir.* 1941), *cert.* denied 314 *U. S.* 678, 62 *S. Ct.* 184, 86 *L. Ed.* 543 (1941).

Concepts of justice change. Doctrines, incomprehensible today, were once embraced by judges who in their times were doubtless the epitome of the reasonable man. Surely this is so in long-range retrospect. It is equally true that at the moment of change the choice is not necessarily between dead right and dead wrong. The judicial scene is studded with issues upon which conflicting views command respectable support. When a court alters its course, it is often but a preference, a belief that justice is better served in another way, with no intimation that whoever disagrees must be mean or inane. So recently, although we disapproved prior decisions relating to the jury's role with respect to the voluntariness of a confession and preferred another approach for the future, we declined to reverse the conviction before us since we could not say a different view held by so many was innately unjust. *State v. Smith,* 32 *N. J.* 501, 557–558 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961) ; see also *State v. Johnson,* 37 *N. J.* 19 (1962).

Nor is it a decisive difference that *Mapp* deals with a constitutional guaranty rather than a principle of lesser stature. Even as to constitutional issues, divergent positions may each reasonably claim organic truth. Surely this must be so with respect to the question whether evidence illegally seized should be excluded from the trial, a question which divided courts throughout the country for so many years and on which the holding of *Mapp* attracted but a bare majority of the Court.

We are not dealing with a denial of a right which bears upon the truth of a conviction, as for example, the right to counsel or to appellate review. See, *e. g., Carnley v. Cochran,* 82 *S. Ct.* 884, 8 *L. Ed. 2d* 70 (1962) ; *Eskridge v. Washington State Board,* 357 *U. S.* 214, 78 *S. Ct.* 1061, 2 *L. Ed. 2d* 1269 (1958), and *Griffin v. Illinois,* 351 *U. S.* 12, 76 *S. Ct.* 585, 100 *L. Ed.* 891 (1956). Rather the subject is

evidence, the probative force of which is constant whether it is seized with or without warrant. The heroin was heroin, and defendant's connection with it was the same, with or without official compliance with the law of search and seizure. In short, the fairness of the trial itself and the truth of the verdict are not involved. The constitutional injury lies elsewhere. What we have said would bear upon whether a pre-*Mapp* conviction may be assailed either on direct appeal or on collateral attack.[1] The State, however, argues for a result short of either of those points. It contends *Mapp* is inapplicable to any seizure made before the date that case was decided. We heretofore assumed otherwise in *State v. Valentin*, 36 *N. J.* 41 (1961). There we had granted leave to appeal from an interlocutory order denying a pretrial motion to suppress the product of a search. Prior

---

[1] In this connection we note some developments since *Mapp*. In *People v. Loria*, 10 *N. Y. 2d* 368, 223 *N. Y. S. 2d* 462, 179 *N. E. 2d* 478 (*Ct. App.* 1961), it was held to be clear that *Mapp* applies to all trials held after the date of *Mapp*, a majority of the court then holding that, whether or not compelled to do so, it should apply *Mapp* to appeals from prior convictions under the general practice of deciding cases in the light of the law at the time of appellate decision. In *Commonwealth v. Spofford*, *Mass.*, 180 *N. E. 2d* 673 (*Sup. Jud. Ct.* 1962), the court held *Mapp* had to be applied on a direct appeal from a pre-*Mapp* conviction. Collateral attack or the equivalent, however, was denied in *State v. Long*, 71 *N. J. Super.* 583 (*Cty. Ct.* 1962) ; *People v. Muller*, 11 *N. Y. 2d* 154, 227 *N. Y. S. 2d* 421, 182 *N. E. 2d* 99 (*Ct. App.* 1962) ; *People v. Figueroa*, 220 *N. Y. S. 2d* 131 (*Kings Cty. Ct.* 1961) ; *People v. Oree*, 220 *N. Y. S. 2d* 121 (*Bronx Cty. Ct.* 1961) ; and *Hall v. Warden*, 201 *F. Supp.* 639 (*D. Md.* 1962). See also concurring opinion of Mr. Justice Traynor in *In re Harris*, 16 *Cal. Rptr.* 889, 366 *P. 2d* 305 (*Sup. Ct.* 1961). In *Winkle v. Bannan*, 368 *U. S.* 34, 82 *S. Ct.* 146, 7 *L. Ed. 2d* 91 (1961), the court vacated the judgment and remanded the cause on suggestion of the State "for consideration in light of *Mapp v. Ohio*." Apparently a collateral attack was there involved, but the opinion of the United States Supreme Court cannot be read to dispose of the issue or to foreshadow the ultimate view. *Cf.* *United States v. Gaitan*, 295 *F. 2d* 277 (10 *Cir.* 1961), *cert.* denied 82 *S. Ct.* 939, 8 *L. Ed. 2d* 15 (1962). See generally, Bender, "The Retroactive Effect of an Overruling Constitutional Decision: *Mapp v. Ohio*," 110 *U. Pa. L. Rev.* 650 (1962).

to argument of the appeal, *Mapp* was decided. We thereupon remanded the matter to the end that all of the facts might be adduced, with directions to determine the motion to suppress in the light of *Mapp*. We note also that after *Valentin* trial courts granted relief with respect to pre-*Mapp* seizures. *E. g., State v. Masi,* 72 *N. J. Super.* 55 (*Law Div.* 1962).

In essence the State's position is that *Mapp.* prohibits the use of illegally seized evidence, not because such use itself violates the Constitution, but rather as a deterrent against future official lawlessness. If this be so, *Mapp* should apply only to subsequent searches, since what has happened is beyond deterrence. True, retroactive application would make the holding of *Mapp* all the more emphatic, but the State says such emphasis, being unnecessary, would be punitive to society and a windfall to the guilty.

In the long debate before *Mapp,* most of the disputants agreed the constitutional wrong was in the invasion of privacy by an illegal search rather than in the use of the product of the search. The quarrel revolved about the need of a rule of exclusion as a deterrent to official misconduct. The advocates of the exclusionary rule contended that other remedies were illusory, that the right of privacy could be protected only by denying government the fruit of the invasion. Thus in *Elkins v. United States,* 364 *U. S.* 206, 217, 80 *S. Ct.* 1437, 1444, 4 *L. Ed.* 2d 1669, 1677 (1960), Mr. Justice Stewart said:

"Yet, however felicitous their phrasing, these objections hardly answer the basic postulate of the exclusionary rule itself. The rule is calculated to prevent, not to repair. Its purpose *is to deter— to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.* See *Eleuteri v. Richman,* 26 *N. J.* 506, 513, 141 *A.* 2d 46, 50." (Italics added)

That thesis would support the State's position. The question is whether the majority in *Mapp* departed from it.

In his separate opinion Mr. Justice Black said he was still not persuaded that the Fourth Amendment forbade the use of the evidence, but, recurring to *Boyd v. United States,* 116 *U. S.* 616, 6 *S. Ct.* 524, 29 *L. Ed.* 746 (1886), he found that the Fourth, "considered together with the Fifth Amendment's ban against compelled self-incrimination," required exclusion (367 *U. S.,* at *p.* 662, 81 *S. Ct.,* at *p.* 1695, 6 *L. Ed. 2d,* at *p.* 1094). Upon that approach, the use of the product of the illegal search would itself be a constitutional wrong.

But Mr. Justice Clark, speaking for himself and three others, did not adopt the thesis of Mr. Justice Black. Rather he dealt with the issue in terms of a sanction to deter official lawlessness and indeed quoted the portion of *Elkins* which we italicized above. (367 *U. S.,* at *p.* 656, 81 *S. Ct.,* at *p.* 1692, 6 *L. Ed. 2d,* at *p.* 1090.) He did, however, also say the Fourth Amendment includes a "most important constitutional privilege, namely, the exclusion of the evidence which an accused had been forced to give by reason of the unlawful seizure," (*ibid.*) ; and further, referring to a "coerced confession," he added, "Why should not the same rule apply to what is tantamount to coerced testimony by way of unconstitutional seizure of goods, papers, effects, documents, etc.?" (367 *U. S.,* at *p.* 656, 81 *S. Ct.,* at *p.* 1692, 6 *L. Ed. 2d,* at *p.* 1091.) The query is whether, by these additional statements, Mr. Justice Clark went beyond the preventive thesis and found that the use of the product of the search itself constituted a constitutional wrong.

We doubt that Mr. Justice Clark meant, by the portions to which we last referred, that the use of the product of the illegal search would constitute compulsory self-incrimination. Mr. Justice Harlan in his dissent seems not to have read the opinion in that vein, since he directed only to the opinion of Mr. Justice Black his response that (367 *U. S.,* at *pp.* 685–686, 81 *S. Ct.,* at *p.* 1708, 6 *L. Ed. 2d,* at *p.* 1107) "we have only very recently again reiterated the

long established doctrine of this Court that the Fifth Amendment privilege against self-incrimination is not applicable to the States. See *Cohen v. Hurley,* 366 *U. S.* 117, 81 *S. Ct.* 954, 6 *L. Ed. 2d* 156."

Mr. Justice Clark did refer to *Boyd,* upon which Mr. Justice Black relied, but Mr. Justice Clark did not accept that decision as decisive. *Boyd,* we think, is distinguishable. There, the court struck down a statute which authorized a subpoena to a defendant to produce documents upon pain of an adverse inference if he failed to comply. The thesis of the court was that the Fourth Amendment forbade a search for inculpatory *evidence* as such, and in that respect the Fourth subserved the same objective of the Fifth's ban against self-incrimination. Thus it followed that a court order upon a defendant to produce mere *evidence* ran afoul of both constitutional provisions. But whereas in *Boyd* (and, for further example, in the case of an involuntary confession) coercion would yield evidence which under the thesis of *Boyd* could not be obtained by compulsory process in the face of the Fifth Amendment, yet both in *Mapp* and in the case before us, the Fourth Amendment itself recognizes the right of government to use force to obtain articles that are contraband notwithstanding they also serve to evidence guilt. The "coercion" upon the accused is the same whether the search be with or without legal warrant. Hence, if the articles can lawfully be seized, it is not the use of force which offends the Constitution but rather the failure to comply with the constitutional prerequisites for the use of that force. Thus viewed, the problem seems not to be one of self-incrimination.

At any rate, the fact is that Mr. Justice Clark did apply the rule of exclusion in the case before him, thus giving retroactive effect to the new rule. Conceivably a court could limit retroactive benefit to the litigant who obtained the change, as a premium to induce challenges to questionable doctrines. But there is no suggestion of that view in the opinion of Mr. Justice Clark, and footnote 9

(367 *U. S.,* at *p.* 659, 81 *S. Ct.,* at *p.* 1693, 6 *L. Ed. 2d,* at *p.* 1092), while not dispositive, seems to indicate that some retroactive effect was contemplated. In these circumstances, we cannot say that *Mapp* is inapplicable merely because the search antedated it.

## II.

At the trial defendant explored the circumstances of the search and seizure without objection by the State. Perhaps the reason was that we had indicated in *Eleuteri v. Richman,* 26 *N. J.* 506, *cert.* denied 358 *U. S.* 843, 79 *S. Ct.* 52, 3 *L. Ed. 2d* 77 (1958), that, while we adhered to the non-exclusionary rule, yet we might depart from it if the facts demonstrated insolence in office as distinguished from a good-faith failure to stay within the technical rules of search and seizure. But counsel, after thus inquiring into the facts, made no objection to the offer of the articles seized. In footnote 9 to which we have already referred (367 *U. S.,* at *p.* 659, 81 *S. Ct.,* at *p.* 1693, 6 *L. Ed. 2d,* at *p.* 1092), Mr. Justice Clark said:

"As is always the case, however, state procedural requirements governing assertion and pursuance of direct and collateral constitutional challenges to criminal prosecutions must be respected."

Our rules require that objection to the admission of evidence be made at the trial. *R. R.* 1:5–1(a). But since the defense should not be charged with failing to anticipate *Mapp,* we will accept the issue in this case and decide the appeal on the law as it now exists and the record made below. Whether the issue would be accepted on direct appeal from a pre-*Mapp* conviction if nothing in the record suggested a basis for questioning the reasonableness of the search, we need not now decide. See *People v. Farrara,* 46 *Cal. 2d* 265, 294 *P. 2d* 21 (*Sup. Ct.* 1956); *People v. Friola,* 11 *N. Y. 2d* 157, 227 *N. Y. S. 2d* 423, 182 *N. E. 2d* 100 (*Ct. App.* 1962).

On September 4, 1959 at about 3:00 P. M. defendant Smith, Leonard Atkinson and William M. Lundy were arrested in a flat occupied by Smith's mother on the third floor of a three-family house, 93 Prince Street, Newark. At the time of the arrest a quantity of heroin and a hypodermic needle were seized. The officers had neither a search warrant nor an arrest warrant.

The arrests were effected by Detectives Suckey and Howard of the narcotics squad of the Newark police. We gather that the detectives had received information concerning narcotics and relating to "Lonnie" and "Shank," who, it later developed, were Atkinson and Smith. When the detectives reached 93 Prince Street, they were engaged in the investigation of a lead, although we infer they believed something might happen since they arranged for two other officers to cover the rear stairway. The detectives proceeded through the common hallway to the third floor. Looking through a crack at the molding of the door (although one officer could not recall whether he looked through that opening or through the keyhole), they saw Lundy in the living room, with a tourniquet around his arm and a hypodermic needle in his hand. They immediately broke in and arrested the individuals we have mentioned. The needle was found on the floor of that room and packets of heroin, in plain view on a table in the same room, were seized. The tourniquet had already been secreted. It was later produced by Smith. The police officers at the rear door were admitted by a woman who also was in the apartment.

## A.

The precise contours of *Mapp* are as yet unclear. We advert to some problems even though we need not now express a view upon them, to the end that the bench and bar may consider them in this new area of litigation.

A basic question is whether *Mapp* means that evidence must be excluded whenever it is found that the search was

"unreasonable," even though the officer had no purpose to ignore the constitutional guaranty. If the exclusionary rule is a preventive sanction to deter insolence in office, it may well be enough to impose the sanction only when conduct of that character appears. As we suggested in *Eleuteri v. Richman, supra* (26 *N. J.*, at *p.* 514), "It is one thing to condemn the product of an arrogant defiance of the Constitution; it is another to impose the sanction when the official intends to respect his oath of office but is found to be mistaken, let us say, by the margin of a single vote."

In *Eleuteri* we noted (26 *N. J.*, at *p.* 515) that:

"California switched to the exclusionary doctrine by one vote. *People v. Cahan*, 44 *Cal.* 2d 434, 282 *P.* 2d 905, 907, 50 *A. L. R.* 2d 513 (*Sup. Ct.* 1955). The case involved 'deliberate, flagrant acts in violation of both Constitutions and the laws enacted thereunder.' The court referred to the criticism of the subsidiary rules concerning unreasonable search and seizure developed by the federal courts and expressly reserved to itself the adoption of workable principles. In footnote 4, the court recognized that unreasonable searches and seizures

'may involve only minor intrusions of privacy or result from good-faith mistakes of judgment on the part of police officers. There is no reason, of course, why, if the exclusionary rule is adopted, appropriate exceptions could not be developed to govern these latter situations. On the other hand, deliberate, flagrant violations of the constitutional guarantees like those in the present case and in *Irvine v. People of California*, 347 *U. S.* 128, 74 *S. Ct.* 381, 98 *L. Ed.* 561, may be as dangerous to ordered liberty as the coercion of confessions. (See, *Allen, Due Process and State Criminal Procedures*, 48 *Nw. L. Rev.* 16, 26–27).' "

In *Mapp* (367 *U. S.*, at *p.* 651, 81 *S. Ct.*, at *p.* 1689, 6 *L. Ed.* 2d, at *p.* 1088) Mr. Justice Clark referred to *Cahan* but had no occasion to comment upon the reservation of the California court which we have just noted. It may, however, be significant that Mr. Justice Clark spoke of violations of a flagrant character. Thus, he said that upon reconsideration of *Wolf,* the Court was led "to close the only courtroom door remaining open to evidence secured by

*official lawlessness in flagrant abuse* of that basic right" (367 *U. S.*, at *p.* 654, 81 *S. Ct.*, at *p.* 1691, 6 *L. Ed. 2d*, at *p.* 1089). Again, he referred to *"brutish* means of coercing evidence" (367 *U. S.*, at *p.* 655, 81 *S. Ct.*, at *p.* 1691, 6 *L. Ed. 2d*, at *p.* 1090), and to "the right to be secure against *rude* invasions of privacy by state officers" (367 *U. S.*, at 660, 81 *S. Ct.*, at *p.* 1694, 6 *L. Ed. 2d*, at *p.* 1093) (the emphasis in these excerpts is ours). Hence it may be that, as to the states, the rule of exclusion will be confined to situations in which bad faith or indifference to the constitutional right is palpable.

■ Another problem involves the law of arrest. It is clear that as an incident to a lawful arrest, with or without a warrant for arrest, a reasonable search may be made even though a search warrant was not obtained. *United States v. Rabinowitz,* 339 *U. S.* 56, 70 *S. Ct.* 430, 94 *L. Ed.* 653 (1950); *Abel v. United States,* 362 *U. S.* 217, 80 *S. Ct.* 683, 4 *L. Ed. 2d* 668 (1960); Annotation, 4 *L. Ed. 2d* 1982 (1960). The question is whether the legality of an arrest will be measured wholly by state law.

Heretofore the law of the State has been the point of reference, *e. g., United States v. Di Re,* 332 *U. S.* 581, 68 *S. Ct.* 222, 92 *L. Ed.* 210 (1948), but prior to *Mapp* the issue was usually relevant only with respect to a federal prosecution. But since the exclusionary rule now applies to the states, the legality of an arrest becomes ultimately a federal constitutional question, at least insofar as the validity of an incidental search is concerned. The right of privacy guaranteed by the Fourth Amendment can hardly be one thing in one state and something else in another. Indeed, a state's view with respect to arrest may be more restricted than the maximum approach consistent with the Fourth Amendment, thus raising the question whether under *Mapp* a state court may admit evidence seized in connection with an arrest which is unlawful under state law but which could have been authorized by the state without impinging upon the Amendment.

■ The problem further revolves about the definition of a "felony." At common law a peace officer could arrest if he had a reasonable basis to believe a felony was committed by the person he apprehends, even though the felony was not committed in his "presence." *Brown v. State,* 62 *N. J. L.* 666, 695 (*E. & A.*), affirmed 175 *U. S.* 172, 20 *S. Ct.* 77, 44 *L. Ed.* 119 (1899); *Delafoile v. State,* 54 *N. J. L.* 381, 383 (*E. & A.* 1892). Our criminal code does not use the word "felony." Rather all crimes (other than "murder," *N. J. S.* 2A:113–1, and "treason," *N. J. S.* 2A:148–1) are denominated as "misdemeanors," while a petty offense is called a "disorderly person offense." The maximum penalty upon conviction as a disorderly person is one year in jail and a fine of $1,000. *N. J. S.* 2A:169–4. Misdemeanors carry a maximum of three years plus a fine of $1,000. *N. J. S.* 2A:85–7. Some misdemeanors are characterized as "high" misdemeanors, for which a larger sentence may be imposed. *N. J. S.* 2A:85–6. There is no equation between a "high" misdemeanor and the common-law felony, the characterization being wholly for the purpose of punishment, *Brown v. State, supra* (62 *N. J. L.,* at *p.* 695); *State v. Woodworth,* 121 *N. J. L.* 78, 82 (*Sup. Ct.* 1938); *cf. State v. Smith, supra* (32 *N. J.,* at *p.* 531). Hence the denomination of a crime as a misdemeanor or high misdemeanor is not the solvent of the question whether the offense is a felony within the common law of arrest. *Cf. State v. Genese,* 102 *N. J. L.* 134, 142–143 (*E. & A.* 1925).

Elsewhere, for sundry purposes, a felony is deemed to be an offense for which a sentence to the state penitentiary could be imposed. See 22 *C. J. S. Criminal Law* § 6, *p.* 15; Annotation, 95 *A. L. R.* 1115 (1935); *Firestone v. Rice,* 71 *Mich.* 377, 38 *N. W.* 885 (1888). It is significant that the Congress has defined a "felony" to be any offense "punishable by * * * imprisonment for a term exceeding one year," 18 *U. S. C.* § 1, and has authorized federal officers to "make arrests without warrant * * * for any felony cognizable under the laws of the United

States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony," 18 *U. S. C.* §§ 3052, 3053. If that criterion should be controlling, our misdemeanors, since they carry an authorized penalty of three years for which a sentence to state prison could be imposed, *N. J. S.* 2A:164–15, would be "felonies" within the common law of arrest.

Although we have sundry statutes dealing with arrest, we do not have a comprehensive one. With the advent of *Mapp,* legislative consideration would indeed be appropriate.

We have outlined the problem to the end, as we have said, that the bench and bar may be aware of it in handling the considerable litigation precipitated by *Mapp.* We need not do more in this case since we are satisfied, as we shall now demonstrate, that an offense was committed in the "presence" of the arresting officers.

### B.

█ As we have said, the common law of arrest differentiated between "felony" and "misdemeanor." As to a "misdemeanor," within its meaning in the law of arrest, a peace officer could arrest without a warrant if the offense was committed in his "presence." See *Brown v. State, supra* (62 *N. J. L.,* at *p.* 695); *Webb v. State,* 51 *N. J. L.* 189, 190 (*Sup. Ct.* 1888). There are some expressions which would confine the authority to arrest without a warrant to misdemeanors involving or likely to involve "a breach of the peace." Although that qualification has been echoed in our cases, see *Pine v. Okzewski,* 112 *N. J. L.* 429, 432 (*E. & A.* 1933); *Wiegand v. Meade,* 108 *N. J. L.* 471, 473 (*Sup. Ct.* 1932); *Collins v. Cody,* 95 *N. J. L.* 65, 67 (*Sup. Ct.* 1920); *Mayor, etc., of Newark v. Murphy,* 40 *N. J. L.* 145, 149 (*Sup. Ct.* 1878), none seems actually to have turned upon it. "Breach of the peace," in relation to arrest, is vague and of doubtful utility or reason. We note that the

Uniform Act on Intrastate Fresh Pursuit (*N. J. S.* 2A:156–1) does not contain that qualification. So also members of the State Police may arrest without warrant "for violations of the law committed in their presence," *N. J. S. A.* 53:2–1, and any police officer may arrest for a disorderly person offense "committed in his presence," *N. J. S.* 2A:169–3. In the light of these legislative expressions, we see no reason to accept or continue a requirement that there be a breach of the peace or the likelihood of one. We add that the federal statutes cited above (18 *U. S. C.* §§ 3052, 3053) do not contain that limitation.

██ We think it clear that here the officers, prior to entry for the purpose of arrest, had probable cause to believe an offense was being committed. Probable cause exists "if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States,* 361 *U. S.* 98, 102, 80 *S. Ct.* 168, 171, 4 *L. Ed. 2d* 134, 138 (1959). When the officers saw Lundy with the tourniquet in place and the needle in hand, they had ample reason to believe, in the light of the information they had already acquired, that Lundy was violating *N. J. S.* 2A:170–77.5 (possession of hypodermic needle), *N. J. S.* 2A:170–8 (use of narcotics) and *R. S.* 24:18–4 (unlawful possession of a narcotic drug).

██ The sole question in this regard is whether the offenses were committed in the "presence" of the officers. The term "presence" sums up the requirement that the officer know of the event by the use of his senses. See Annotation, 76 *A. L. R. 2d* 1432, 1441 (1961); *Griffin v. State,* 200 *Md.* 569, 92 *A. 2d* 743, 746 (*Ct. App.* 1952), *cert.* denied 345 *U. S.* 907, 73 *S. Ct.* 647, 97 *L. Ed.* 1343 (1953). Here the officers saw the offense. That they saw it through a crack in the door or the keyhole does not affect the direct character of the knowledge gained or the conclusion that the offense occurred in their "presence" within the meaning of that word. Rather it raises at best a different question, whether thus to peer into private property

through an aperture constitutes a search, with the result that the arrest depended upon the product of the search, rather than the search upon the arrest. See *Chapman v. United States,* 365 *U. S.* 610, 81 *S. Ct.* 776, 5 *L. Ed. 2d* 828 (1961).

Unlike *McDonald v. United States,* 335 *U. S.* 451, 69 *S. Ct.* 191, 93 *L. Ed.* 153 (1948), where the officers forced a window in the landlady's bedroom and then proceeded to the second floor, where, through a transom, they observed illegal conduct, here the officers entered a common hallway and from that area saw the criminal event. Whether the officers were technically "invitees" of the owner of the house is of no moment. Rather the question is whether there was an invasion of the privacy of the owner or tenant as to which the defendant might assert a derivative interest. As to the owner, surely a policeman does not trespass when he enters the common areas in discharge of his duties. And as to the tenant (defendant's mother), it cannot be said that she was in possession of the passageway. Thus the presence of the detectives at the door to the apartment itself involved no misconduct or invasion of the rights of anyone. A policeman is not out-of-bounds when he is in the common passageway of a multi-family house in the furtherance of an investigation.

 This leaves the fact that officers looked through an opening to view what was going on within the apartment. Peering through a window or a crack in a door or a keyhole is not, in the abstract, genteel behavior, but the Fourth Amendment does not protect against all conduct unworthy of a good neighbor. Even surveillance of a house to see who enters and leaves is something less· than good manners would permit. But it is the duty of a policeman to investigate, and we cannot say that in striking a balance between the rights of the individual and the needs of law enforcement, the Fourth Amendment itself draws the blinds the occupant could have drawn but did not. In the absence of a physical entry into premises secured by the Amendment,

there is no unreasonable search. In such circumstances it has been held that the guaranteed right of privacy is not violated when a police officer, by use of his senses, detects a criminal event occurring in an area protected by the Amendment. As to eavesdropping, see *Goldman v. United States,* 316 U. S. 129, 62 S. Ct. 993, 86 L. Ed. 1322 (1942) (even with aid of detectaphone; *cf. Silverman v. United States,* 365 U. S. 505, 509–510, 81 S. Ct. 679, 5 L. Ed. 2d 734, 738 (1961)); *United States v. Buchner,* 164 F. Supp. 836 (D. D. C. 1958), affirmed mem. 106 U. S. App. D. C. 16, 268 F. 2d 891 (D. C. Cir. 1958), *cert.* denied 359 U. S. 908, 79 S. Ct. 584, 3 L. Ed. 2d 573 (1959); *People v. Rucker, Cal. App.,* 17 Cal. Rptr. 98 (Ct. App. 1961). As to looking through windows, cracks in walls or doors, etc., see *Agnello v. United States,* 269 U. S. 20, 46 S. Ct. 4, 70 L. Ed. 145 (1925); Jackson, J., concurring in *McDonald v. United States, supra* (335 U. S., at p. 458, 69 S. Ct., at p. 194, 93 L. Ed., at 160); *Burks v. United States,* 287 F. 2d 117 (9 Cir. 1961); *Martin v. United States,* 155 F. 2d 503 (5 Cir. 1946); *United States v. Purgitt,* 176 F. Supp. 557 (D. D. C. 1959); *People v. Martin,* 45 Cal. 2d 755, 290 P. 2d 855 (Sup. Ct. 1955); *People v. Ruiz,* 146 Cal. App. 2d 630, 304 P. 2d 175 (Ct. App. 1956); *Griffin v. State, supra* (200 Md. 569, 92 A. 2d 743); *Wilkes v. State,* 105 Tex. Cr. R. 430, 289 S. W. 44 (Ct. Crim. App. 1926). As to looking through a window from a fire escape, compare *Cheng Wai v. United States,* 125 F. 2d 915 (2 Cir. 1942) (apartment house), with *Whitley v. United States,* 99 U. S. App. D. C. 159, 237 F. 2d 787 (D. C. Cir. 1956) (rooming house).

C.

The remaining question arises from the conceded fact that the officers did not demand admittance or reveal their mission before breaking in. In *Miller v. United States,* 357 U. S. 301, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958),

it was held that an arrest was unlawful when the officers broke in without a demand or a statement of their mission, and hence evidence seized in connection with the arrest must be excluded. Although there is a federal statute (18 *U. S. C.* § 3109) which provides that an officer may break in to execute a search warrant "if, after. notice of his authority and purpose, he is refused admittance," it is clear the Supreme Court deemed the statute to reflect the common law with respect to the arrests with or without a warrant (*357 U. S.*, at *p.* 308, 78 *S. Ct.*, at *p.* 1195, 2 *L. Ed. 2d*, at *p.* 1337).

We assume for present purposes that *Mapp* makes *Miller* applicable to the states even though the authority to arrest is clear and the claimed illegality inheres in the manner in which the arrest was made. The question then falls within the area as to which *Miller* expressly reserved judgment (*357 U. S.*, at *p.* 309, 78 *S. Ct.*, at *p.* 1195, 2 *L. Ed. 2d*, at· *p.* 1338):

"* * * There are some state decisions holding that justification for noncompliance exists in exigent circumstances, as, for example, when the officers may in good faith believe that they or someone within are in peril of bodily harm, *Read v. Case*, 4 *Conn.* 166, 10 *Am. Dec.* 110, or that the person to be arrested is fleeing or attempting to destroy evidence. *People v. Maddox*, 46 *Cal. 2d* 301, 294 *P. 2d* 6.
But whether the unqualified requirements of the rule admit of an exception justifying noncompliance in exigent circumstances is not a question we are called upon to decide in this case. The Government makes no claim here of the existence of circumstances excusing compliance. The Government concedes that compliance was required but argues that 'compliance is evident from the events immediately preceding the officers' forced entry.' "

In *People v. Maddox*, 46 *Cal. 2d* 301, 294 *P. 2d* 6 (*Sup. Ct.*), *cert.* denied 352 *U. S.* 858, 77 *S. Ct.* 81, 1 *L. Ed. 2d* 65 (1956), referred to in the portion of *Miller* quoted above, the court was confronted with a state statute essentially the same as the federal act in *Miller*. The court held that the likelihood that the evidence would be destroyed

if the officers announced their mission was sufficient to excuse compliance with the act. To the same effect is *People v. Hammond*, 54 *Cal. 2d* 846, 9 *Cal. Rptr.* 233, 357 *P. 2d* 289 (*Sup. Ct.* 1960).

The *Restatement, Torts* § 206, sustains that view. It provides that there may be a breaking without explanation of the errand and demand for admittance if the officer "reasonably believes" it "to be impractical or useless" to comply with those preliminary steps. Comment (d) points out that while there are risks of injury involved in a sudden entry, yet these requirements may be dispensed with if the officer reasonably believes "such explanation and demand would tend to frustrate" his mission.

We must identify precisely what is involved. We are not dealing with the sufficiency of the basis for a search. Probable cause existed. The right to invade the privacy of the occupant was clear. And it is of no moment that a search warrant had not issued; the problem would be the same if the magistrate's warrant were in hand. The State was entitled to seize the contraband. The nature of the contraband was such that if the officers' mission had first been announced, the articles likely would have literally gone down the drain. Indeed, the tourniquet was successfully secreted despite the nature of the entry. In short, if admittance had first been demanded, the State's clear right to search and seize as an incident to the arrest could have been defeated. Pushers of narcotics usually have but small quantities with them, the easier to part with their wares in the face of an arrest, and users rarely have a large supply.

The question then is whether the Fourth Amendment intended to nullify the State's clear right to search by imposing a condition which would defeat it. If the State's right to the contraband is to be denied, it must be because of the evident danger and rudeness of a sudden entry. But the danger and the rudeness are not the gratuitous product of official insolence or indifference; they are the consequences of the criminal enterprise, made inescapable by its

nature. Moreover, in striking a balance between the right of the State and the rights of the individual, the need to protect the innocent is not a conspicuous factor; for, as we have said, the hypothesis includes the existence of probable cause and indeed a reasonable basis to believe a criminal event is in progress. Hence, to require that admittance be demanded and the mission revealed before entry into the premises would, overall, benefit the guilty alone. It seems to us that the Fourth Amendment does not transmute a "reasonable" search into an "unreasonable" one merely because the officer discharged his duty to arrest and search in a manner which fairly appeared necessary for the successful enforcement of the State's right. At any rate, in these circumstances the exclusion of the evidence would not be an appropriate sanction in the light of the probable rationale of the exclusionary rule.

For these reasons we are satisfied the articles in question were properly received in evidence.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.