**UNITED STATES of America,
Plaintiff,**

**v.**

**GREENHEAD, INC., Defendant.**

**Cr. No. 14224.**

United States District Court
N. D. California, N. D.

June 28, 1966.

Rothwell B. Mason, Asst. U. S. Atty., Sacramento, Cal., for plaintiff.

Gilford G. Rowland, Sacramento, Cal., for defendant.

## MEMORANDUM AND ORDER

HALBERT, District Judge.

It seems unfortunate indeed that an already overburdened United States District Judge (See: Brown v. Heinze, D. C., 248 F.Supp. 293) should have to spend the time and effort that I have had to spend in performing a single phase of the last rites of five wild ducks who had the misfortune to fly into the line of fire of a "sportsman" (Used advisedly, because no one thus far has asserted that the ducks were legally taken.). More than 2,000 years ago it was observed that "What is one man's meat is another man's rank poison," so I must assume that I have somewhere lost my sense of perspective. The case being before me, I propose to do my duty to the best of my ability.

The purpose of this proceeding is to suppress, as evidence, under Rule 41(e) of the Federal Rules of Criminal Procedure, the five dead ducks previously mentioned. Evidence has been taken on two separate days, I have visited the scene of the alleged offense or sporting

event (depending on how you look at snuffing out the lives of five wild ducks without benefit of stamp or license), counsel for each party has provided me with learned memoranda, and after a thorough consideration of all matters connected with this proceeding, I am prepared to administer the legal estate of the deceased five wild ducks.

Of course the issue to be resolved by these proceedings is whether the five wild ducks were seized in violation of the Fourth Amendment to the Constitution of the United States. Two collateral issues must be resolved before we can determine whether the castle of the Corporation has been unlawfully breached.

First, did the Wardens have a right to go onto the property of the defendant on October 25, 1964? There are no facts in dispute here. I have only an issue of law to resolve in connection with this facet of the case.

Second, did Warden Doyle have a right to enter the "shack" and seize the five dead ducks? Here there are both factual and legal issues for me to resolve.

## I.

I would have supposed that as true sportsmen the members of Greenhead, Inc., would have welcomed the Wardens on their property in order to make certain that wild ducks do not go the way of the heath hen and the passenger pigeon,[1] if for no other good reason. And, of course, as law-abiding citizens I would have supposed that they would have wanted to be certain that no one had violated the law on their premises. But I presume that I do not see the matter through the eyes of Nimrod, so I will just have to look at it through the eyes of a simple Judge.

Greenhead, Inc., is a corporation engaged in the pursuit of wild fowl. Its hunting area and the place where the al-

leged violation of the game laws was committed is a 600 acre tract of land in the Suisun Marshes adjacent to the Sacramento River near Fairfield, California. The land in question is enclosed by fence, and the only apparent access is through two padlocked gates. On October 25, 1964, Thomas Harper, a Game Management Agent with the United States Fish and Wildlife Service, and Dennis Doyle, a California State Game Warden deputized by the federal agency, opened the two padlocked gates with a key of uncertain parentage and entered the Greenhead property. According to Agent Doyle, the reason for their entry was a "routine patrol":

> "This is just a general practice toward the end of the season—that we check the various duck clubs * * * for licenses, duck stamps, and to see how the shooting is. * * * It is part of our job to make a weekly report to our office and to report to them as to how the shooting was, and reasons such as that." (RT 51:9–15)

Neither party here appears to dispute the fact that at the time of the Wardens' entry they had no knowledge or suspicion that the game laws were being violated (They may have been as naive as I am.). They were simply doing what I suspect all good game management men do during the hunting season—"just looking around."

After driving several miles through the marsh, the agents arrived at the Greenhead, Inc., clubhouse area. The clubhouse is located high on a hill overlooking the acres of marsh land where the wild fowl stop during their southward trek. Part way down the hill is a small garage, and at the foot, near some boat slips, are two buildings which are used primarily for cleaning and temporarily storing the freshly killed birds. The largest of those two buildings is called

---

1. Every sportsman who thinks that there is an endless supply of game should read the recently published book by Allan W. Eckert entitled, The Silent Sky—The Incredible Extinction of the Passenger Pigeon. I am neither an avid hunter nor a dedicated conservationist (just an ordinary citizen), but this book was a revelation to me, and I am confident that it will be so to any open and fair-minded person.

the "trapper's shack." It is a wooden building approximately fifteen feet wide and approximately thirty feet long. The front is a small screened porch, and at the back is a small added room which was in the not too recent past used as a bedroom. There is no indication, in the record or in the building itself, that the shack had in recent years been used as an abode for a human being.

Some distance from the trapper's shack is the "hanging room" which, in spite of the vision which its name induces, is used for storage and cooling of freshly killed birds.

On the other side of the trapper's shack, across a driveway, are two tables used for the picking and cleaning of birds.

When the agents arrived in the general area, they found a member of the Club standing near the tables with some twenty birds in close proximity. Two members of the Club were quickly summoned, and they claimed some of the birds, but when their "limits" were deducted, it was nonetheless apparent that the hapless hunter had been discovered with too many birds.

As Agent Harper discussed the matter with that man, Warden Doyle passed by the trapper's shack where he noticed in the shadows five dead ducks hanging from a nail on the rear wall.[2] He entered and found that the ducks were not tagged as is required by law.[3] He seized the birds as he was required to do,[4] and subsequently Greenhead, Inc., was charged with illegal possession of five ducks, pursuant to Regulation 10.9(b)

(See: supra, Note 3). The sole question presented is whether or not those ducks were seized in violation of the Fourth Amendment and should thus be suppressed as evidence in the case.

## II.

To a simple District Judge, the issue presented is not unduly complex. A long and settled line of cases has established that a mere trespassory entry onto open land will not, in and of itself, vitiate an otherwise lawful search. The mere fact that Warden Doyle and Agent Harper were not given permission to enter the Greenhead property is not sufficient support for the present motion to suppress (See: Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898; United States v. Sorce, 7 Cir., 325 F.2d 84; and United States v. Romano, 2 Cir., 330 F.2d 566). As Chief Judge Lumbard said in *Romano* supra:

" * * * it is well settled that evidence is not rendered inadmissible merely because it has been obtained in the course of a simple trespass on land. The protection accorded by the Fourth Amendment * * * does not extend to open fields, or to unoccupied buildings." (330 F.2d at 569)

By the same token, I think it is apparent that Warden Doyle's entry into the trapper's shack did not invade any constitutionally protected interest of the defendant corporation. I do not find convincing the argument that a trapper's shack, not used as a residence (nor apparently for anything other than to hide ducks), is a protected "place" within the

2. One of the major factual issues in this proceeding was whether Warden Doyle could see the ducks from outside the shack. I have viewed the scene, and I am convinced that Warden Doyle told the truth when he said that he could see the ducks from a position outside the shack.

3. Regulation 10.9(b), 50 C.F.R., Chap. I (1965 Supp.), the violation of which is made a misdemeanor by Title 16 U.S.C. § 707, provides in part:
"No person may receive or have in custody any migratory game birds be-

longing to another person unless such birds are tagged as required under paragraph (a) of this section."

4. Title 16 U.S.C. § 706 reads in part:
" * * * All birds * * * possessed contrary to the provisions of said sections or of any regulations made pursuant thereto *shall*, when found, be seized by any such employee, or by any marshal or deputy marshal, and, upon conviction of the offender * * * shall be forfeited to the United States * * *." (Emphasis added.)

meaning of the Fourth Amendment. I have previously set forth my views on that subject in United States v. Thomas, D.C., 216 F.Supp. 942, and I do not propose to review that analysis here. Suffice it to say that the cases there discussed have consistently held that a building such as the trapper's shack, not used as a dwelling and in no way associated with a dwelling, is not protected by the Fourth Amendment (See, e. g., Hester v. United States, supra; and see cases collected in Anno., 89 A.L.R. 715).

Defendant, however, argues that the instant search was a "fishing expedition" and thus, *a fortiori*, unconstitutional. The cited cases do not support such a broad proposition, and the necessities of effective law enforcement preclude the application of such talismanic standards. A number of alternative approaches to the search in question come to mind,[5] but the plain fact of the matter is that under the circumstances the search was not unreasonable.

### III.

 If it be assumed, *arguendo,* that the trapper's shack was in law a "place," the unlawful invasion of which would constitute a violation of the Constitution, it is nonetheless apparent that the search in question did not violate any constitutional right of the defendant.

In Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, Mr. Justice Jackson stated:

"There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search

may be dispensed with." (333 U.S. at 14–15, 68 S.Ct. at 369)

Implicit in that statement of a balancing test is the concept that as the facts of the case approach the periphery of privacy, the requirements demanded of an officer are correspondingly less exacting. We must keep the balance true for both the decent folks and for those who defy the law.

 On one side of the scale of justice is found a corporation engaged in the pursuit of wild fowl. That pursuit is a high privilege granted by the people and subject to immediate withdrawal (See: Geer v. State of Connecticut, supra). Without such a grant, the hunt would be unlawful (See: Title 16 U.S.C. § 703). And, though a corporation is now deemed to be, in most respects, a "person" so far as the Constitution is concerned, there is no unqualified right to be let alone. As the Supreme Court observed in United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401:

"Although the 'right to be let alone' * * * is not confined literally to searches and seizures as such, but extends as well to the orderly taking under compulsion of process, * * * neither incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret. * * *" (338 U.S. at 651–652, 70 S.Ct. at 368)

On the other side is the ever decreasing call of the wild duck. Subject as they are to the constantly increasing pressures of "civilization," it is a small miracle that the ducks have not gone the way of some of the other wildlife with which California was once blessed.[6] The Fish

---

5. E. g. that the "duck tags" are records required by law to be kept and thus not within the full protection of the exclusionary rule (See: Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771; United States v. Shapiro, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787); that the illegal ducks were public property and thus subject to a relaxed standard (Compare: Geer v. State of Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 and Davis v. United States, 328 U.S.

582, 66 S.Ct. 1256, 90 L.Ed. 1453); that the search, being part of a pervasive scheme of administrative remedies, was not unlawful (See: Frank v. State of Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877; Note, 30 Mo.L.Rev. 612).

6. Antelope and elk once roamed our great valleys in vast herds. They are no more. Gone, too, is the grizzly bear, once the pride of our State.

and Wildlife Service, however, is making a valiant effort to conserve this precious national resource. Their efforts ought not be stultified by grossly expanded concepts of the right of privacy. In the course of their efforts, the Agents may perhaps offend, for no respectable businessman enjoys being caught with the fruit of his illegal acts, but this is not sufficient reason to enhance the law to a place where it would protect the defendant under circumstances which exist here. The defendant asserts that the "protection of the Fourth Amendment is not solely for the benefit of drug peddlers, rapists and communist conspirators * * * but is for the protection of *all* citizens * * *" (emphasis in original, Reply Brief, pg. 6). I am not impressed by that invocation of a truism. The plain fact remains that these men, these "pillars of the community," have in fact a higher duty than less fortunate members of society, for it is from their example of citizenship that the children of our Republic inevitably will form their opinions of a government of laws. If we cannot win the war for men's minds at that level, we cannot win at all.

On the balance, I cannot say that Warden Doyle was infringing upon the defendant's constitutional rights when he, miles from the nearest Commissioner, looked through the open door of the trapper's shack, saw five dead ducks, entered, observed, and seized (See: Travis v. United States, 362 F.2d 477 [United States Court of Appeals for the Ninth Circuit, No. 20187. Decided June 14, 1966]). I agree with the defendant that he might not have been able to ascertain beyond all peradventure of a doubt that those ducks were not properly tagged, but in the light of the events of the day and the great quantities of dead birds with which he was then surrounded, Warden Doyle had probable cause to believe that those ducks, hidden away in the shadows of the trapper's shack, were "illegal" ducks. That being the case, he had not only the right, but the duty, to investigate and, upon discovery, confiscate those ducks (See: Title 16 U.S.C. § 706, quoted supra, Note 4).

It is, therefore, ordered that defendant's motion to suppress evidence pursuant to Rule 41(e), Federal Rules of Criminal Procedure, be, and the same is, hereby denied.