**Charles KATZ, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 20648.**

United States Court of Appeals
Ninth Circuit.

Nov. 17, 1966.

Certiorari Granted March 13, 1967.
See 87 S.Ct. 1021.

Burton Marks, Beverly Hills, Cal., for appellants.

Manuel L. Real, U. S. Atty., John K. Van De Kamp, Chief Asst. U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Asst. Chief, Crim. Div., Michael P. Balaban, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS and BARNES, Circuit Judges, and POWELL, District Judge.

POWELL, District Judge:

The appellant was charged in each count of an eight count indictment with

a violation of Title 18 U.S.C. § 1084.[1] That statute proscribes the interstate transmission by wire communication of bets or wagers, or information assisting in the placing of bets or wagers by a person engaged in the business of betting or wagering. Each count involved a violation on a different date or at different times on the same date. Appellant waived a jury. The district judge found appellant guilty on all counts.

The appellant moved to suppress evidence in the possession of the government and for the return of the evidence and the dismissal of the indictment. Following a hearing, the motions were denied. On the motion to suppress the evidence was substantially as follows:

In February of 1965 the appellant was seen placing calls from a bank of three public telephone booths during certain hours and on an almost daily basis. He was never observed in any other telephone booth.

In the period of February 19 to February 25, 1965, at set hours, Special Agents of the Federal Bureau of Investigation placed microphones on the tops of two of the public telephone booths normally used by the appellant. The other phone was placed out of order by the telephone company. The microphones were attached to the outside of the telephone booths with tape. There was no physical penetration inside of the booths. The microphones were activated only while appellant was approaching and actually in the booth. Wires led from microphones to a wire recorder on top of one of the booths. Thus the F.B.I. obtained a record of appellant's end of a series of telephone calls.

A study of the transcripts of the recordings made of the appellant's end of the conversations revealed that the conversations had to do with the placing of bets and the obtaining of gambling information by the appellant.

On February 23, 1965, F.B.I. Agent Allen Frei rented a room next to the appellant's apartment residence. He listened to conversations through the common wall without the aid of any electronic device. He overheard the appellant's end of a series of telephone conversations and took notes on them. These notes and the tapes made from the telephone booth recordings were the basis of a search warrant which was obtained to search appellant's apartment. The search warrant called for " * * * bookmaking records, wagering paraphernalia, including but not limited to, bet slips, betting markers, run-down sheets, schedule sheets indicating the lines, adding machines, money, telephones, telephone address listings * * * ". (See N. 4). The articles seized are described in the return (C.T. 20–22). They are all related to the categories described in the warrant.

During the conversations overheard by Agent Frei, the appellant made numerous comments to the effect that "I have Northwestern minus 7", and "Oregon plus 3." Also, there was a statement by the appellant such as, "Don't worry about the line. I have phoned Boston three times about it today."

At the trial evidence was introduced to show that from February 19 to February 25, 1965, inclusive, the appellant placed calls from two telephone booths.

---

1. The pertinent part of 18 U.S.C. § 1084 is as follows:

"(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

"(b) Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State where betting on that sporting event or contest is legal into a State in which such betting is legal."

located in the 8200 block of Sunset Boulevard in Los Angeles. The conversations were overheard and recorded every day except February 22. The transcripts of the recordings and the normal business records of the telephone company were used to determine that the calls went to Boston, Massachusetts, and Miami, Florida.

The testimony of Joseph Gunn of the Administrative Vice Division of the Los Angeles Police Department, who was the expert called by the government in the area of bookmaking, was that the transcripts of the conversations showed that bets were made and information assisting in the placing of bets was transmitted on the dates and at the times alleged in the indictment. Bets were recorded like "Give me Duquesne minus 7 for a nickel." [2] Information relating to the line and the acquiring of credit was also transmitted.

In correlating the transcript of the telephone conversations and line sheets and markers found in appellant's residence during the search pursuant to the warrant, Officer Gunn concluded that appellant was placing wagers with a bookmaker for another person for a consideration.

On February 25, 1965, the appellant was arrested. He was advised by a Special Agent of the F.B.I., Emmett Doherty, that he had a right to remain silent, he had a right to consult counsel, and that any statements he made could be used against him in a court of law. The appellant was arrested on the street. He was later present in his apartment where another agent of the F.B.I. was involved in the search authorized by the search warrant. Appellant asked when he could have his records back. He stated that without them he was out of business and that he knew no other trade. During this exchange, in response to a question about interstate betting, the appellant said that he could not bet locally because the bookmakers would not pay off.

The next day, which was February 26, 1965, Agent Donovan of the F.B.I. met appellant in the lobby of his apartment building to return two personal items which had been taken at the time of the search. Donovan had been with Agent Doherty the day before when Doherty advised the appellant of his rights with respect to statements made to the Federal Agents. Appellant again asked why he could not have his records back. He stated without them he was out of business and that he had been a handicapper and a bettor most of his life. He suggested that if he got his records back he would continue to bet.[3]

From all of the evidence in the case the court found the volume of business being done by the appellant indicated that it was not a casual incidental occupation of the appellant. The court found that he was engaged in the business of betting or wagering at the time of the telephone

2. "A Mr. Katz is playing for somebody else and getting a percentage out of it. When he says he is only getting a dollar, this would mean that on a thousand dollar bet he would be getting a hundred dollars in this instance.
  Q Is he using what is called the nickel system?
  A Yes, sir.
  Q In referring to his bets?
  A Yes.
  Q What is the nickel system?
  A The nickel system is terminology in which a $500 bet would be called a nickel, a $1,000 bet would be called a dime. The $100 bets are usually referred to as a dollar or two dollars.
  Also when you record on the nickel system you omit to the right of the decimal point so that $2,500 would be written 25 and two small zeros rather than writing four decimal point zero zero." (RT 240).

3. "THE WITNESS: I returned to Mr. Katz a nail file and a key chain. Upon his taking them he said, 'I can replace these for 35 cents. Why can't I have my records? Without my records I am out of business. I have been a handicapper and a bettor most of my life, and it has taken hours and hours and hours of compilation to prepare these records.'
  "Mr. Katz continued as to the time factor in the records, and then suggested that if he could have his records back he would continue betting. And he facetiously made the comment, 'Then I can lead you to the big ones.'" (RT 219, 220).

conversations which were transmitted and recorded. (RT 316, 317).

## I. *Recording of Phone Booth Conversations.*

The appellant argues that the evidence obtained at the time of the recording of the appellant's end of the conversations in the phone booth constituted an illegal search and seizure in violation of the Fourth Amendment to the United States Constitution. Appellant urges this on authority of Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), which he says expresses the current attitude of the Supreme Court.

In the Silverman case the agents used a spike microphone which was driven into a party wall. It contacted a heating duct of the house occupied by the petitioners. This enabled the agents to hear conversations in the entire house, including conversations on the telephone. The case was reversed because of the invasion into a "constitutionally protected area." The court said, "the officers overheard the petitioners' conversations only by usurping part of the petitioners' house or office". (365 U.S. at 511, 81 S.Ct. at 682). It was held to be a violation of the petitioner's Fourth Amendment rights.

Appellant cites cases which we have considered. In People of the State of California v. Hurst, 325 F.2d 891 (9 Cir. 1963), there was an unlawful invasion of premises used as a residence. We do not consider Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), as authority sustaining appellant's position as that case sustained the right to record a conversation between a government agent and the suspect. United States v. Paroutian, 299 F.2d 486 (2 Cir. 1962), was reversed because a search of an apartment without a warrant produced evidence later used to search the same apartment after the defendant's right to possession had terminated. This last case would apply only if we found that the evidence obtained by the recording of the phone conversations here was in violation of appellant's Fourth Amendment rights. This we decline to do.

The public phone booth was used by appellant, who argues that when he occupied it for the purpose of engaging in a personal conversation and closed the door to the booth, he is in effect in his own residence. By invitation from the telephone company and the payment of the toll he says he is entitled to consider the booth protected from intrusion by the Fourth Amendment. In Smayda v. United States, 352 F.2d 251 (9 Cir. 1965), police officers observed events in a stall in a public toilet through a camouflaged hole in the ceiling. The court held that this was not a violation of the Fourth Amendment rights of the defendants on two grounds, 1) the appellants impliedly consented to the search when they carried on their illegal acts in a public toilet, and 2) there was no unreasonable search within the meaning of the amendment. 352 F.2d at 253, 256.

In Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), evidence was introduced which was obtained by tapping the wires of the telephones used by petitioners. It was held that the use of the evidence did not violate the Fourth Amendment rights of defendants.

In Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), federal agents were permitted to testify to conversations overheard by the use of a detectaphone applied to the walls of a room adjoining the office of the defendant. This is similar to the instant case. It was held not to be an invasion of defendant's office.

In the recent case of Corngold v. United States, 367 F.2d 1, 3 (9 Cir. 1966), the appellant objected to the evidence obtained by the use of a "scintillator", an instrument sensitive to radiation. Customs agents saw appellant carrying packages into his apartment. The officers observed the appellant and two other men carrying packages from the apartment to the appellant's car. They followed the appellant as he drove to the Los Angeles International Airport. The scintillator, when used outside of the appellant's apartment, and while following appel-

lant's car, reacted so as to indicate that there was a radioactive substance in the possession of the appellant. The court there said:

"Appellant contends that the walls of his apartment were 'penetrated' and his apartment was searched by means of the scintillation detector in violation of his Fourth Amendment rights, and that it was error to admit evidence obtained in this way.

"The agents entered the apartment building through an unlocked public entrance. They employed the scintillator in public hallways outside appellant's apartment. Goldman v. United States, 316 U.S. 129, [62 S.Ct. 993, 86 L.Ed. 1322] (1942), is controlling authority that appellant's Fourth Amendment rights were not violated. See also On Lee v. United States, 343 U.S. 747, 752–754, [72 S.Ct. 967, 96 L.Ed. 1270] (1952)."

■ The Corngold case sustains the government in the use of the evidence obtained by microphones and tape recordings of the telephone conversations of the appellant in this case. There was no physical entrance into the area occupied by appellant. The Corngold case was reversed on the ground that the agents were not authorized to search the packages in the airport terminal without a search warrant. Here a search warrant was obtained and executed.

## II. *The Search Warrant.*

■ The search warrant described the items to be seized which were instrumentalities of the offense.[4] It is our conclu-

sion that the search warrant does adequately describe the property to be seized. It was not general nor did it describe mere evidentiary matter.

In Gilbert v. United States, 291 F.2d 586 (9 Cir. 1961), this court held that the search was unreasonable when government agents allegedly maneuvered to make the arrest of the defendant in his home. No offense was committed in the presence of the arresting officer. The crime charged was the forgery of a check which the government had in its possession. The items seized were checks and income tax returns which were evidentiary only and not instrumentalities of the crime charged.

We have reviewed the authorities cited by the appellant. The case of United States v. Clancy, 276 F.2d 617 (7 Cir. 1960), (reversed on other grounds in 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574), more nearly resembles the fact situation here. The search warrant described the property to be seized as in this case.[5]

In Leahy v. United States, 272 F.2d 487, 491 (9 Cir. 1959), concerning a search, this court stated as follows:

" * * * The revenue agents in the instant case seized an adding machine, a telephone, record books, receipts, pencils, pens, money and the keys to safety deposit boxes, as well as a number of rifles, shotguns and pistols. It is clear from the items seized that the search was specifically directed to the instrumentalities used in the commission of the crime of unlawfully engaging in the business of wagering. The

---

4. " * * * there is now being concealed certain property, namely bookmaking records, wagering paraphernalia, including but not limited to, bet slips, betting markers, run down sheets, schedule sheets indicating the lines, adding machines, money, telephones, telephone address listings which are designed and intended for use as the means of committing criminal offenses in violation of Title 18, United States Code Section 1084, and violations of 441, 4412 and Section 7203 of the Internal Revenue Code. * * *" (Vol. 1, CT 17).

5. " * * * divers records, to wit books, memoranda, tickets, pads, tablets and papers recording the receipt of money from and the money paid out in connection with the operation of wagering business on said premises, such files, desks, tables and receptacles for the storing of the books, memoranda, tickets, pads, tablets and papers aforesaid, and divers receptacles in the nature of envelopes in which there is kept money won by patrons * * * and divers other tools, instruments, apparatus, United States currency and records * * *'". (276 F.2d at 624).

records of an illicit business are instrumentalities of crime. Marron v. United States, 1927, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (officers incident to arrest may lawfully seize account books and papers used in carrying on the criminal enterprise). Such were the records obtained in this case. The search was, therefore, a reasonable one."

The search warrant was valid and the court was correct in refusing to suppress the evidence obtained on the search.

### III. *The Indictment.*

■ Counsel argues that there was a single violation under the statute, 18 U.S.C. § 1084. This is not borne out by the record as we view it. Each call was a separate act of the defendant in using the telephone and would constitute a separate and distinct offense.

In construing a related statute to 18 U.S.C. § 1084, the court in United States v. Teemer, 214 F.Supp. 952, 958 (N.D. W.Va.1963), said:

" * * * (T)he 'course of conduct' referred to in the * * * legislative history of section 1952, refers to the nature of the business promoted or facilitated—and not to the essence of the federal offense, which is 'travel'. The phrase seems to refer to the fact that the Act was designed to attack an entrenched operation rather than a sporadic poker game or a floating crap game. No act of travel is to be deemed unlawful unless the enterprise is a continuing one; but once the continuity of the enterprise is established, any act or travel, * * * is a daily or regular event, and thus, perhaps, a 'continuing' activity. * * * "

Mitchell v. United States, 142 F.2d 480, (10 Cir. 1944), was an appeal from a conviction of mail fraud. It was held that a continuing scheme once established may support additional charges of violation of the statute. Each act of mailing would constitute a separate and distinct offense once the scheme was established. That would be the case here, as was found in the Teemer case, supra, under 18 U.S.C. § 1952.

### IV. *Constitutionality of 18 U.S.C. § 1084.*

■ Appellant urges that the statute is unconstitutional in that it is indefinite, vague and uncertain, and therefore violates the Fifth Amendment. In support of his argument that this statute is void for vagueness, appellant quotes language from the recent case of Giaccio v. State of Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966). The statute involved there was an 1860 law of Pennsylvania that permitted the taxing of costs against a defendant acquitted in a criminal case. A reading of that statute shows that it fixed no standards for its application. It was vague and uncertain.

In Turf Center, Inc. v. United States, 325 F.2d 793, 795 (9 Cir. 1963), this court held 18 U.S.C. § 1952 as not void for vagueness. That section is similar to and a companion section to 18 U.S.C. § 1084.

"A statute meets the standard of certainty required by the Constitution if its language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. * * * The fact that in some cases it may be difficult to determine the side of the line on which a particular fact situation falls is not sufficient reason to hold the language too ambiguous to define a criminal offense. * * * "

We do not consider the authorities cited by the appellant as sustaining his position that this statute is void or that it interferes with the right of free speech. The plain and unambiguous language used in the statute is entitled to its ordinary and reasonable interpretation. This statute meets the standard of certainty required by the Constitution.

### V. *Sufficiency of the Evidence.*

■ A complete review of the record has been made. The evidence was detailed and not substantially disputed.

The defendant presented no testimony. We are convinced that there was sufficient evidence to sustain the conviction of the defendant.

The judgment of conviction is affirmed.