432 P.2d 64

**STATE of Utah, Plaintiff and Respondent,**

v.

**Leon Marlow KENT, Defendant and Appellant.**

No. 10713.

Supreme Court of Utah.

Sept. 22, 1967.

Jimi Mitsunaga, Legal Defender, John D. O'Connell, Salt Lake City, for appellant.

Phil L. Hansen, Atty. Gen., Gary A. Frank, Asst. Atty. Gen., Salt Lake City, for respondent.

NELSON, District Judge:

The defendant-appellant seeks reversal of his conviction of the crime of unlawful possession of a narcotic drug. He was tried by the district court, sitting without a jury. The appeal is based primarily on the ground, and for the reason, that the trial court erred in its refusal to grant the defendant's motion to suppress the evidence seized in a search of his premises by the Salt Lake City police. The facts, in connection with the seizure of the key evidence are as follows:

The defendant and his ex-wife were living together in a unit of a Salt Lake City motel. Police officers had been informed, they claim, by a "reliable informer" that Kent had been connected with a series of drug store burglaries in which narcotics had been taken. The police officers approached the manager of the motel to obtain her consent to the use of a hidden vantage point from which they could keep Kent under surveillance. Following the contact with the manager, Officer Patrick, who with other officers had been engaged in the investigation, entered the attic of the motel where, by looking through a ventilator located in the ceiling of the bathroom of the unit in which the defendant was staying, could observe the entire bathroom and part of the bedroom of the unit. A curved metal shield prevented anyone in the bathroom from being aware that the occupants were being observed. The attic was dark. During the first day the officer did not see anything illegal taking place, but he did hear Kent's ex-wife ask him if he wanted two "V's." It is claimed this had to do with the amount of narcotic to be used.

On the second day Patrick observed Kent enter the bathroom and use a spoon, eye dropper, pacifier and syringe to make what he considered to be a "fix." Patrick radioed this information to Officers Waters and Lindsey who were outside the motel. These two officers then entered the motel unit, without a warrant, and without knocking or announcing their presence, and arrested Kent and his ex-wife. Then they searched the apartment occupied by Kent, being directed and aided by Officer Patrick, who, at his vantage point, gave verbal instructions as to where the narcotics were hidden. Thereupon Waters and Lindsey found the drug or drugs which would induce narcosis.

Prior to the trial appellant moved the court to suppress all testimony regarding what the Officer Patrick saw and heard in the interior of appellant's residence, and the physical evidence seized under his direction. The motion was denied. At the conclusion of the hearing the motion was renewed and again denied.

Appellant claims the evidence thus secured resulted from an unlawful invasion of his premises and his privacy all in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

The respondent submits that the conviction of the defendant and the trial court's denial of his motion to suppress the evidence should be affirmed on the ground there was no physical trespass or unlawful entry into the premises of appellant. The State argues that from the area occupied by Officer Patrick, observation into the unit occupied by defendant was readily available by anyone. The officer did not have to take any affirmative action, such

as removing a cover from the vent, but rather merely observed all that was open to observation. It was further argued that it was possible for someone in the bathroom of appellant to readily ascertain he was being observed through the vent.

Counsel for the respondent has failed to adequately answer the questions which he takes for granted. Did Officer Patrick have the right to place himself over the unit occupied by defendant so as to look down into his bathroom and bedroom? Was the area in which he made his observation a part of the rented unit? If it were, then wasn't the officer an intruder or trespasser? Is it conceivable that defendant would be gazing at the ceiling of his bathroom? Did he not have the right to assume he was in a place of seclusion?

■ The State's dependence on the purported lack of a trespass, according to local property law, as a determinative factor in whether there has been an intrusion into a constitutionally protected area is clearly refuted by Silverman v. United States.[1] It is difficult to distinguish between the vent located in the bathroom in the instant case and the heating system in Silverman which was described as an integral part of the premises occupied by petitioners. The court stated:

Here, by contrast, the officers overheard the petitioners' conversation only by usurping part of the petitioners' house or office—a heating system which was an integral part of the premises occupied by the petitioners, a usurpation that was effected without their knowledge and without their consent. In these circumstances we need not pause to consider whether or not there was a technical trespass under the local property law relating to party walls. *Inherent Fourth Amendment rights are not inevitably measurable in terms of ancient niceties of tort or real property law.* [Citations omitted.]

The Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his home and there be free from unreasonable governmental intrusion. [Citations omitted.]

* * * But decision here does not turn upon the technicality of a trespass upon a party wall as a matter of local law. *It is based upon the reality of an actual intrusion into a constitutionally protected area.* * * * [Emphasis mine.]

The California courts have adopted the principle that although a trespass is a factor to be considered in determining the reasonableness of a search, a minor or technical trespass not involving physical entry

1. 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

into a building does not derogate from the otherwise reasonable nature of the search. Rather it is the degree of privacy which defendant enjoyed in the place involved that is the important factor in determining the reasonableness of the search and essentially that determination must depend upon the facts and circumstances of the particular case.[2]

Having pleaded a violation of both the Fourth and Fourteenth Amendments, we must determine if the Fourth Amendment applies to the states.

█ If there was such a query before the adoption of the Fourteenth Amendment it has now been definitely settled that the provisions of the Fourth Amendment do apply with equal force to the states and in particular to questions of search and seizure.[3]

█ It has also been clearly established by a number of Supreme Court decisions that leased and rented premises would come under the protection of the Fourth Amendment.[4] By the same decisions and others,[5] it now appears to be settled that, in the absence of abandonment, expiration of lease, or other extraor-

dinary circumstances, such as to suppress a riot, save life or property in case of fire, or to prevent escape of a fleeing suspect or to prevent the destruction of evidence, the consent of a landlord or hotel or motel manager would not be sufficient to justify an officer to make a search of tenant's premises without a warrant. A landlord has a duty, as well as a vital interest in cooperating with officers so as to remove himself of suspicion and the right to promptly exculpate himself by allowing a search, but the permission of an innkeeper will not constitute an ersatz in place of a warrant. It is not so much a matter of the officer proceeding in a manner approved by a court, as it is to operate in a way required by law.

The conditions and circumstances of the present case would indicate no emergency was present which would justify the search and seizure effected by the police. If, as the police suspected, the defendant was guilty of stealing narcotics, he would most probably intend to keep them for his own use or for sale to others. In either case he would not be likely to destroy the narcotics except as a last resort to prevent them from being found. Since the defendant apparently had no suspicion that he was

2. People v. Willard, Cal.App., 47 Cal.Rptr. 734, 739, 743 (1966).
3. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.
4. Louden v. Utah, 379 U.S. 1, 85 S.Ct. 87, 13 L.Ed.2d 23; Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856;

Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed. 828; United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59; McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153.
5. Drummond v. United States, 8 Cir., 350 F.2d 983.

being watched, the emergency had not arisen. Also, if he had attempted to leave, the police would have been fully aware of his attempt, and would have been able to stop him. Therefore, no emergency situation existed which justified the police in their search and seizure without a warrant.

There can be no denial that the major duty of the police is to diligently and fearlessly investigate crime and enforce the law. It is their task to apprehend the criminal, and to aid in the determination of his guilt. This is required whether the offense be a misdemeanor of little concern or a felony of great importance and far-reaching effect. It would be inclusive of a charge of jaywalking or of murder. Certainly the apprehension of a miscreant in possession of narcotics, and particularly of one engaged in its sale, demands vigorous and continuing inquiry by the police. No one is more pathetic than a drug addict. No criminal is more venal or despicable than the one who seeks a state of affluence by selling the poison to the degenerate, who, bereft of hope, makes alternate flights into abnormal tensions of euphoria, ecstasy and frenzy, often resulting in psychosis. Yet in ferreting out the iniquitous malefactor responsible for such nefarious trade, the policeman is restricted, prevented from ramifying his search beyond the limitations set by law. The interstice may be narrow between what he may do and what he cannot do. He should avoid furtive procedures and surreptitious methods.

There are those who say in such cases as this that the end would justify the means. Surely where an officer would be permitted to exceed the posted speed limit to overtake a speeder, he should be able to take such action as he would consider necessary to arrest one violating the narcotic act. It is said too much emphasis is placed on protecting the rights of the wrongdoer, and too little attention given to protecting society. To this we cannot subscribe in total. There is an area, not forbidden, in which the officer may exceed granted authority in the performance of duty, but regardless of how desirable the end may be, there cannot be a substantial variance, and especially is this true if the deviation is expressly forbidden by constitutional provision or legislative enactment.

We have held that the processes of law have only one legitimate objective, to seek out the truth and to do justice.[6] The court is not a place affording the opportunity to learned counsel to display their histrionic talents, nor to enact a drama, or comedy. It is a place to determine the truth—the facts of a particular case, to review the law and act accordingly, all that justice may prevail. There should be no dismissal of a charge or reversal of judgment unless the

6. State v. Seymour, 18 Utah 2d 153, 417 P.2d 655.

facts and the law demand such ruling. This requires, however, not only the recognition and preservation of substantive rights, but also a strict adherence to the requirements of adjective law, particularly and especially if the method of procedure has been made mandatory by constitutional provision or legislative act.

Regardless of how beneficial or desirable to society a certain ultimate may be, the court must have the judicial fortitude and integrity, as well as the moral courage, regardless of invidious attacks, to interpret and apply the law as it is. He must act without hope of accolade or fear of obloquy. This is true even though the court may think the law should be different. The court is not a policy-making body. The question is not one of resolving a balance of the rights of the individual and the rights of the group. They are complementary; both having a common conclusion, the good of each and all. In some respects the individual is supreme. Under certain circumstances, the rights of the individual prevail over group authority and group rights. Thus, in the detection of the criminal, as desirable as his apprehension might be, the pursuit must be by due process of law.

The significant point raised by defendant is his alleged violation of his right to privacy as guaranteed by the Fourth Amendment.

There are students of the law who maintain that privacy developed as a parasite upon earlier well-established rights. Thus, some courts have refused to consider the claim unless it has been tied in with some other fundamental right, such as the right to resist trespass.

In England, as well as in this country, notwithstanding court decision to the contrary, respectable scholarly opinion has contended there does, or at all events, there should exist a common law of privacy independent of all other phases or aspects of the law. These students of history and jurisprudence hold it was the common law right of man to have privacy in his home; that it was and is a right which is an indispensable essential of civilization. They claim it was firmly established as one of the bright features of the Anglo-Saxon contributions to human progress. It belonged to all men.[7]

We accept the latter point of view and further hold the right of privacy gives added emphasis to the dignity of man. It rests on the principle that not only man but the sovereign must obey the law. Surely this principle has been recognized since the days of Henry II, and later in the Magna Charta exacted from his son, King John,

7. District of Columbia v. Little, 85 U.S.App.D.C. 242, 178 F.2d 13, 16, 13 A.L.R.2d

**8**

June 15, 1215. Although often suppressed, it most likely existed even prior to the reign of the Plantagenets as found in the customs and rules of the Angles, Saxons and Jutes.

In any event, the right to personal privacy and dignity is protected and guaranteed against unwarranted intrusions by the State by the Constitution of the United States and has been upheld by numerous court decisions.[8] Where this right has not been respected the most terrifying practices have been used.[9]

We readily recall the action in other lands where political forces, acting in the guise of policemen have arrested their victims at all hours, without warrants. Nor have we forgotten the sequence thereto—abolition of habeas corpus, and the liquidation and banishment of those arrested all without judicial review.

We feel Officer Patrick's bathroom observations constituted an unlawful invasion of defendant's privacy.[10] We are of the opinion the defendant, in renting the motel unit, obtained the exclusive right to use it, which included the right to privacy. It is true this right may be forfeited by illegal use of the property, but such unlawful utilization must first be established by legal means.[11]

A right is that to which one has a just claim. A resident of this land has a just claim, God given, or innate as a human being to life, liberty and the pursuit of happiness, and as a corresponding and accompanying right, the right to privacy in his own home.

Privacy means a state apart from company or observation; it means a place of seclusion and secrecy.

---

8. Schmerber v. State of California, 384 U. S. 757, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966); Griswold v. State of Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965), where the court stated: "The present case, then concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees. * * *"

9. Brock v. United States, 5 Cir., 223 F.2d 681; People of State of California v. Hurst, 9 Cir., 325 F.2d 891.

10. Bielicki v. Superior Court of Los Angeles, 57 Cal.2d 602, 21 Cal.Rptr. 552, 371 P.2d 288 (1962); Britt v. Superior Court of Santa Clara County, 58 Cal.2d 469, 24 Cal.Rptr. 849, 374 P.2d 817 (1962).

11. People v. Regaldo, 224 Cal.App.2d 586, 36 Cal.Rptr. 795 (1964); People v. Willard, 47 Cal.Rptr. 734, 738 (1966), where the court stated: " * * * As we observed in People v. Norton, supra, 209 Cal.App.2d 173, 175–176, 25 Cal.Rptr. 676, 677–678, 'the factual essence in Bielicki was the clandestine observation by the police of a place which by its very physical appointments provided privacy to its occupant. * * * Such surveillance therefore, because of the character of the place to which it was directed, of necessity invaded the occupants' constitutionally guaranteed right of privacy. The activities observed by the police in Bielicki were such that no other member of the public could have seen them, since they were carried on in toilet booths fully enclosed by three walls and a door.'"

Home is a dwelling place; it is an anchor; it is a place of retreat and security; an abiding place of loved ones and their affection. It is a protected place—a sanctuary.[12]

The defendant had the right to maintain his place of abode, though it was a room in a motel, as an annulus, free from outside intrusion and observation; a place inviolate where he could repose in security.

It is true there is a difference between a casual or accidental observation and an intentional invasion of property. Intrusion upon private property may constitute trespass, yet not infrequently the gravamen of the harm is the injury to privacy.[13] There is harm in being seen in privacy under unfavorable circumstances.

It is impossible for us to determine whether Officer Lindsey or either of the other officers had sufficient evidence to link the defendant to a series of burglaries. If this were actually the case, then this officer should have secured a search warrant or a warrant for arrest of the defendant based upon the information he had received.

The reason for requiring the police to obtain a warrant is that it requires the police to subject their evidence or information to the scrutinizing of an objective magistrate, who then determines, upon the information available whether a warrant should issue or not. In this way a person's constitutional rights are maintained, and the American system of jurisprudence preserved.

We conclude the evidence obtained by the police in this case was obtained illegally by means of an exploratory search which violated the defendant's constitutional right of privacy. Therefore, the evidence should not have been admitted, and defendant's motion to suppress the evidence should have been granted.

For the reasons stated the conviction of the defendant is reversed.

CALLISTER and TUCKETT, JJ., concur.

CROCKETT, Chief Justice (dissenting)..

There are several salient considerations which impel me to a firm conviction that the opinion of the court is in error.

1. It upsets the determination which it is the prerogative of the trial court to make, that the vital evidence was reasonably and lawfully obtained.

2. On what I believe is a misconceived and overstrained technicality, it overturns the conviction of a defendant, about whose guilt there can be no doubt, and who is of the character which the opinion itself refers to as being an "iniquitous malefactor re-

12. United States v. Greenhead, Inc., D.C., 256 F.Supp. 890.

13. Silverman v. United States, see note 1, supra.

sponsible for such nefarious trade," i. e., in narcotic drugs.

3. It does this by the shocking conclusion that a peace officer (who was *where he had a lawful right to be,* without any physical trespass or invasion into the domain of the defendant, and without the use of any extrasensory aids, *simply observed what he could with his eyes and ears,*) made an "unreasonable search" of the defendant's premises.

4. Its effect is to set such unrealistic restrictions upon police work as to seriously impair their effectiveness in the control of narcotics and the investigation of other crimes, most of which are carried on in secret.

5. In doing 1, 2, 3 and 4 above, it ignores the time-honored precedent requiring survey of the evidence in the light favorable to the findings of the trial court and of indulging credit to his determination. On the contrary, it selects aspects of the evidence to suit what impresses me as a labored effort to arrive at a preconceived and desired result.

*The sole and controlling issue in this case* is whether the observations made by Officer H. W. Patrick into the defendant's motel room constituted "an unreasonable search" prohibited by the Fourth Amendment to the United States Constitution. I declaim this with the utmost possible emphasis because the court's opinion does not seem to me to meet that issue squarely, but on the contrary, leaves it somewhat obscure by discussing a number of other matters about which there is no dispute.

To avoid misunderstanding I concede that the Fourth Amendment applies to the states; that when one rents a hotel room it becomes for most purposes his home or his castle. Similarly I agree with the desirability of safeguarding the rights of people to be secure in their persons and in their homes from any unwarranted or highhanded intrusions into their rights of privacy. Nor do I disagree with the standard definitions of certain terms given. But inasmuch as there is no disagreement about those matters, I am somewhat at a loss to understand what discussing them has to do with what I insist is the only disputed and the controlling issue here, whether there was an unreasonable search.

A proper application of the United States Constitution, as with any law, requires reflection upon the circumstances which produced it and the intent with which it was adopted. It will be remembered that there had indeed been highhanded and ruthless intrusions into and searches of private homes, which facts were well known to the founders. Those are the abuses that the Bill of Rights was intended to guard against. What is important is that these protections be employed as intended and not become so detached from their reasons for existence that where there is no such abuse,

they provide a cloak of protection to enable lawbreakers to carry on criminal activities against the law-abiding citizenry and escape detection and punishment, and thus obstruct rather than promote the good order of society. It requires but little reflection to see that the very right to be secure in person, home and property which the defendant prates about for his protection is dependent upon competent and efficient law enforcement. This in turn depends upon not imposing undue restrictions upon officers in the detection and prosecution of crime so that they will have reasonable freedom of action in the investigating process.[1] The public is entitled to protection as well as those suspected of crime.

This purpose is not served by inquiring whether there may have been a technical misstep or irregularity against some hypertechnical interpretation of the letter of the law in circumstances where it was not intended to apply. It neither serves that objective, nor is it in harmony with my sense of justice, to regard the rules as some sort of game in which a person engaged in crime has a "sporting chance" to beat the law. The critical question is whether, under the particular circumstances, it can fairly and justly be said that the search was a high-handed or oppressive intrusion against the defendant's rights. It was undoubtedly for this reason that the founders in the language of the Fourth Amendment did not assure against all searches, but only against those which are "unreasonable."[2]

As indicated in the court's opinion, the officers set about to keep watch on the goings to and from and the goings on in the defendant's motel unit. They were acting on information from what they regarded as a "reliable" source. It related to drugstore burglaries in which narcotics had been taken. From this information and the fact that the landlady had observed through the window the defendant's wife putting portions of a white powder into little bits of paper, there was good reason to believe that they were engaged in trafficking in narcotics. Officer Patrick requested of the manager of the Tower Motel and was given permission to go into the open area above the motel units.

Because of the issue here raised, and the applicable law, it is important to visualize as clearly as possible from the rather sparse record the area from which the observation was made and its relationship to the defendant's motel unit.

1. See State v. Seymour, 18 Utah 2d 153, 417 P.2d 655.
2. See statement in Davis v. United States, 327 F.2d 301 (9th Cir. 1964). "It is no answer to say that the police could have obtained a search warrant, for '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.'" See also Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

There was a stairway leading from the office through a door up to the second story or attic area which extends over the whole area over the motel units. The officer testified:

> She took me to [the] overhead area, which is where all the heating and air conditioning ducts, all the wires and the access to the boiler room was, above the unit area. *It encompasses the whole upstairs story of the units or of the motel.* And in the area above the defendant's apartment we had access to an open [louvered] vent to the bathroom through which we felt we could make visual and verbal observations.

It was from this overhead or open attic area, by observing and listening at this louvered vent, that the officer maintained surveillance of the defendant's motel unit. The main opinion correctly recites: that "the officer did not have to take any affirmative action, such as removing a cover or vent, but rather merely observed what was open to observation"; and further, that "it was possible for someone in the bathroom * * * to readily ascertain he was being observed through the vent." It was two days later, while continuing such observation, that the officer saw the defendant enter the bathroom with materials for preparing a dose of narcotics.

The statement in the main opinion that "no emergency was present" shows a singular lack of appreciation of the problems involved in the seeking out and convicting those who traffic in narcotics. The nefarious nature of narcotic drugs and the evils ramifying from their use and trafficking therein by enticing victims into its toils are well known. The many and ingenious ways of disguising and concealing dope, and the quick and easy disposal of it, have been the subject of so much literature and drama that the difficulties involved in apprehending and convicting those who use and traffic therein need no further exposition here.

It should be here stated with the greatest of emphasis, to avoid diversion from the true issue, that no one, not even the defendant, contends otherwise than when Officer Patrick had good reason to believe a felony was being committed, as he learned from his observation here, the entry, the arrest and seizure of the evidence was justified; and at that point no search warrant was necessary.[3] I confess my inability to understand how anyone could conclude otherwise than that under those circumstances the officer did that which was absolutely

---

3. For a statement as to the probable cause necessary to sustain an arrest and a search incidental thereto see McCray v. State of Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); see also Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 434, 94 L.Ed. 653 (1950); Ker v. State of California, supra note 2.

necessary in the line of his duty. He quickly made contact by two-way radio with other officers who immediately entered the apartment, made the arrest, and seized the narcotics and other materials which are the subject of the motion to suppress evidence.[4] The fallacy of the main opinion is compounded by the statement "if he had attempted to leave, the police would have been fully aware of his attempt, and would have been able to stop him." There of course, would have been no evidence, and what a plight the police would have been in, under the hypertechnical attitude of the main opinion against police activities.

In cases dealing with the question it is almost invariably affirmed that whether a search is unreasonable depends upon the particular circumstances.[5] The responsibility for making this determination is initially upon the trial court. As the authority in charge of the trial he must make determinations of fact upon which admissibility of evidence depends. It is to be assumed

that he is learned in the law and in rules of evidence and that he is motivated by a desire to apply them in the interests of justice. Furthermore, he is able to make firsthand observation of the parties and the witnesses, and is thus in a position of advantage to make the essential determination: whether the conduct of the officers has so transgressed standards of common decency and fairness that the search is "unreasonable." [6] For these reasons his ruling thereon should be indulged with a presumption of correctness and validity,[7] and should not be disturbed unless it clearly appears that he was in error.[8]

In considering whether looking or listening through an opening into an accused's "abode" runs counter to the Fourth Amendment, some courts have taken the view that such an observation is not a "search" at all. But where it is assumed to be a search, the problem of vital concern is whether it is unreasonable. A fundamental doctrine which will be found in all of the leading

4. As to right of police to enter and seize narcotics which can be quickly destroyed see Ker v. State of California, supra note 2; Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1959); State v. Smith, 37 N.J. 481, 181 A.2d 761 (1962), cert. denied 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055 (1963).

5. Cooper v. State of California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); Ker v. State of California, supra note 2; Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); United States v. Rabinowitz, supra note 3.

6. " 'It is Hornbook law that this court cannot second-guess a trier of fact who has heard testimony, scrutinized the witnesses, and noted their demeanor and behavior on the witness stand * * * and had the opportunity * * * to place his reliance on those whom *he* believes to have been telling the truth.' " Davis v. United States, supra note 2.

7. Ker v. State of California, supra note 2; United States v. Rabinowitz, supra note 3; Miller v. United States, 354 F. 2d 801 (8th Cir. 1966).

8. State v. Tuttle, 16 Utah 2d 288, 399 P. 2d 580 (1965), cert. denied 382 U.S. 872, 86 S.Ct. 129, 15 L.Ed.2d 110 (1965).

cases dealing with this subject is that.where there is no trespass and no physical invasion of the defendant's abode there is no unreasonable search. The doctrine was announced in Goldman v. United States,[9] and On Lee v. United States. [10]

There is a paradox quite incomprehensible to me in the main opinion's citing the case of Silverman v. United States [11] to support its conclusion. I join wholeheartedly in citing that case and say without fear of reasonable contradiction that a fair comparison with the instant one will clearly and unequivocally defeat the reversal of the conviction here. There in 1961, nine years after the On Lee case, the U. S. Supreme Court rejected a plea to overrule it and reaffirmed the requirement of a physical invasion to constitute an unreasonable search. The peace officers used what is called a "spike mike" driven into the wall to make contact with a heating system which was used as a sounding device. In the decision Justice Stewart discussed this fact

and placed stress on the requirement of a physical intrusion into the defendant's premises in accordance with the rule as established in the Goldman and On Lee cases, supra, which rule has never been departed from. He stated that, "the eavesdropping was accomplished by means of an unauthorized *physical penetration into the premises* occupied by the petitioners." Incidentally, there was no dissent in that case. Justices Clark and Whittaker in concurring stated in part, "[T]he unauthorized *physical penetration into petitioner's premises constituted sufficient trespass* to remove this case from the coverage of earlier decisions, we feel obliged to join in the Court's opinion." [12]

This physical invasion requirement has been adhered to with practically invariable uniformity even where the observation has been made by various types of sensory aids,[13] in such circumstances as looking through a window,[14] and even looking through keyholes, cracks and vents in walls

9. 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942).

10. 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). See also: Ker v. California, supra note 2; Davis v. United States, supra note 2; State v. Allred, 16 Utah 2d 41, 395 P.2d 535.

11. 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961).

12. This position was reaffirmed in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). See also the recent case of Berger v. State of New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040.

13. This position was reaffirmed in Lopez v. United States, supra note 12, and Clinton v. Virginia, 377 U.S. 158, 84 S. Ct. 1186, 12 L.Ed.2d 213 (1964); United States v. Pardo-Bolland, 348 F.2d 316 (2nd Cir. 1965), cert. denied 382 U.S. 944, 86 S.Ct. 388, 15 L.Ed.2d 353 (1965). See also Katz v. United States, 369 F.2d 130 (9th Cir. 1966), cert. granted and pending 386 U.S. 954, 87 S.Ct. 1021, 18 L.Ed.2d 102 (1967).

14. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Burks v. United States, 287 F.2d 117 (9th Cir. 1961), cert. denied 369 U.S. 841, 82 S.

and ceiling, so long as the policeman observes from a place where he has a right to be and does not physically invade the defendant's premises.[15]

In the case of State v. Smith,[16] in answer to the charge that peeking into a private residence through an aperture constituted an unreasonable search, the New Jersey Supreme Court made this very pertinent comment:

> Peering through a window or a crack in a door or keyhole is not, in the abstract, genteel behavior, but the Fourth Amendment does not protect against all conduct unworthy of a good neighbor. * * * [I]t is the duty of a policeman to investigate and we cannot say that in striking a balance between the rights of the individual and the needs of law enforcement, the Fourth Amendment itself draws the blinds the occupant could have drawn but did not. *In the absence of a physical entry into premises secured by the Amendment, there is no unreasonable search.* In such circumstances it has been held that the guaranteed right of

privacy is not violated when a police officer, by use of his senses, detects a criminal event occurring in an area protected by the Amendment.

In the instant situation, if the officer had watched from outside a window, or from an adjoining room through an air vent or other aperture, and had thus learned of the defendant's possession of narcotics, it surely could not be seriously contended that he would not have had the right to make the arrest and seizure. The fact that the vent was overhead rather than in a wall should make no material difference. It was necessary for the landlord and others to have access to the upstairs area from which the observation was made in order to take care of various services to all of the motel units. It was thus common to all of the motel units and had no exclusive relationship to the defendant's apartment. There can be no question about the landlord's right to be in this upstairs area, nor of her right to give the officer permission to be there. It therefore follows with indisputable certainty that there was no physical trespass or invasion into the defendant's room.

Ct. 868, 7 L.Ed.2d 846 (1962), and Petteway v. United States, 261 F.2d 53 (4th Cir. 1958).

15. The language of Justice Jackson's concurring opinion in McDonald v. United States, 335 U.S. 451, 458, 69 S.Ct. 191, 194, 93 L.Ed. 153 (1948), is frequently quoted: "Had the police been admitted as guests of another tenant, or had the approaches been thrown open by an obliging landlady or doorman, they would have been legally in the hallways. Like any other stranger, they could then spy or eavesdrop on others without being trespassers. If they peeped through the keyhole or climbed on a chair or on one another's shoulders to look through the transom, I should see no grounds on which the defendant could complain."

16. 37 N.J. 481, 181 A.2d 761 (1962), cert. denied 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055 (1963).

A statement in the concurring opinion by Judge Pope in Smayda v. United States,[17] is particularly appropriate:

There is nothing wrong with an officer detecting crime from a place *where he has a right to be,*

* * * the defendant's lack of knowledge that the holes above the stalls were view windows is immaterial. *I know of no rule of law that a person committing a crime must be alerted or warned that he is being watched.* [Citing the Goldman and On Lee cases referred to above.]

That assertion is incontestable. I think that it is unfair, illogical and does violence to law and justice to suppress evidence and reverse a conviction under circumstances here shown, where a police officer *was where he had a lawful right to be,* used no extrasensory aids and simply observed that which he could observe by the use of his eyes and ears. The instant opinion gives lip service to the doctrine that "the processes of law have only one legitimate objective, to seek out the truth and to do justice," but proceeds to defeat that very objective by an unwarranted suppression of evidence upon which the conviction of one known to be guilty must rest.

On the basis of the foregoing discussion of the facts and the application of law it is my conviction that there is no justification for suppressing this evidence and upsetting this conviction, nor more importantly, for setting an erroneous and dangerous precedent which will result in unreasonable restrictions upon police work in coping with traffic in narcotics and the investigation of other crimes. I would affirm the trial court. (All emphasis added.)

HENRIOD, J., dissents.

---

17.  352 F.2d 251 (9th Cir. 1965), cert. denied 382 U.S. 981, 86 S.Ct. 555, 15 L.Ed.2d 471 (1966).